# VIRGINIA K. BLOODSWORTH

## vs.

# ALPHEUS B. MURRAY AND WADE BLOODSWORTH.

*Proceeding in Land Office—Caveat to Patent—Evidence—
Adverse Possession.*

On a hearing by the Commissioner of the Land Office of a
caveat to the issue of a patent, it was proper to disregard plats
made by the county surveyor and another, not based on an
actual survey by either.                                    p. 644

Former patents covering the land in question should not be
disregarded by the Commissioner because not located by surveys,
if they refer to natural boundaries.                        p. 644

If the caveator shows that the land in question is contained
within the bounds of former patents, his caveat may be sus-
tained though such land is not within the lines of his property.
                                                            p. 644

On a hearing in the Land Office of a caveat to the issue of a
patent, *held* that the caveator made out a good title by adverse
possession, his possession being as complete as possible consid-
ering the character of the land as marsh land, and the only use
thereof by others being by trespassing trappers.            p. 644

In determining whether one has an actual possession of prop-
erty, its character and locality, and the uses and purposes for
which it is naturally adapted, are to be considered, since the
possessory acts over an outlying and uncultivated piece of land
may be proved by acts of ownership somewhat different from
what is required in regard to land under enclosure and in actual
cultivation.                                        .       p. 645

*Decided June 27th, 1921.*

Appeal from the Commissioner of the Land Office.

The cause was submitted on briefs to Boyd, C. J., Briscoe, Thomas, Pattison, Urner, Stockbridge, Adkins, and Offutt, JJ.

*Gordon Tull,* for the appellant.

*Harry C. Dashiell* and *Miles & Myers,* for the appellees.

Adkins, J., delivered the opinion of the court.

This is an appeal from an order of the Land Commissioner dismissing a caveat.

A certificate of survey was filed May 20th, 1920, by Levin H. Hall, Surveyor of Somerset County, as follows:

"Certificate of Survey.

"(Returned and Filed May 20, 1920.)

*"State of Maryland, Somerset County, to wit—*

"By virtue of a Special Warrant for one acre issued on the 1st day of March, 1920, by the Commissioner of the Land Office of Maryland to Alpheus B. Murray and Wade Bloodsworth, of Mt. Vernon Election District, Somerset County, Maryland, and to me directed, requiring me to survey a certain tract or parcel of Vacant Land situate, lying and being in Mt. Vernon Election District, Somerset County, Maryland:

"I hereby certify that as Surveyor of said Somerset County, Maryland, that after giving at least one month's notice, prior to beginning the execution of the said Warrant, by inserting the attached notice in the "Marylander and Herald," a weekly newspaper published in said Somerset County, of the State of Maryland, two consecutive times, to wit, on the 9th day of March, 1920, and on the 16th day of March, 1920, and complying with all other laws in such cases made and provided for, I have carefully surveyed for and in the name of them, the said Alpheus B. Murray and Wade Bloodsworth, a certain tract or parcel of vacant land situate, lying and being in Mt. Vernon Election District, Somerset County, Maryland, and more fully described as follows:

"Beginning for the same at a locust post and iron bounder on the eastern side of a body of water or stream of water called and known by the name of the 'Lower Thoroughfare'; thence running up the said Thoroughfare and binding on the eastern side thereof the two following courses and distances, viz: north eighteen degrees east fourteen poles, north sixty-eight degrees east ten poles to the mouth of Sassafras Gut; thence up said Gut and binding on the southern shore thereof the two following courses and distances, to wit: east twenty-two poles, south sixty-five degrees east twenty-two poles; thence running south twenty-eight degrees east twenty-nine and one-half poles across the marsh to the 'Upper Thoroughfare'; thence running down the western short of the said 'Upper Thoroughfare' and binding thereon the four following courses and distances, viz: south twenty-seven degrees west four and one-half poles, south twenty-six degrees east fourteen poles, south forty-two and one-half degrees west thirty-six poles, south fifty-three degrees west fifty-two poles to the shore of Monie Creek; thence running up said Creek and binding thereon north forty-five degrees west six poles, north five degrees east forty-two poles, north five degrees west forty-four poles to the beginning, and containing thirty-four acres, more or less.

"To be held by the name of 'Murray and Bloodsworth Island.'

"The above tract of land consists entirely of marsh land and has no improvements thereon. It has within its lines no navigable waters. The chain carriers on the survey were duly sworn.

"Surveyed the 10th day of April, 1920.

"Per Levin H. Hall,
"Surveyor of Somerset County, Maryland."

With the certificate a plat was filed, and a certificate of publication of the required notice by the surveyor. Upon the certificate of survey the following endorsement appears:

"Land Office of Maryland,
"Annapolis, Md., June 3d, 1920.
"Examined and passed, subject to correction of 10th course and closing line.

"Jas. S. Shepherd,
"Com'r Land Office."

On July 7th, 1920, Virginia K. Bloodsworth, the appellant, filed a caveat to the issuing of a patent to the appellees on the certificate filed, and assigned the following reasons:

"First—Because the land, or the greater part thereof, included in said certificate is land which is also included in patents which formerly issued out of the Land Office of Maryland, and known as 'Covington's Meadow,' 'Comfort's Adventure,' 'Father's Care,' 'Middle,' 'Comfort,' and 'The Lot'; that the land included in the said certificate of Alpheus B. Murray and Wade Bloodsworth is included in one or the other of the above named patents which formerly issued out of the Land Office of Maryland, has never since escheated to the State of Maryland, and is now owned by the caveator, as life tenant, under the last will and testament of her husband, John Robert Bloodsworth, late of Somerset County, deceased, which said will is duly recorded among the Wills Records of Somerset County in Liber H. H. D. No. 6, folios 229, etc.

"Second—Because the land mentioned in said certificate of Murray & Bloodsworth is the same land or a part thereof conveyed unto John Kirwan by deed from Ellicott Kirwan, dated the 26th day of February, 1817, and duly recorded among the Land Records of Somerset County in Liber I. D. No. 2, folios 269 *et seq.*, the land conveyed therein being sixty-five acres on the north side of the great Monie Creek and bordering thereon; and also the same land or a part thereof conveyed to John Kirwan, Jr., by John Kirwan, Sr., made on the 30th day of April, 1832, and duly recorded as aforesaid in Liber G. H. No. 6, folio 226, and also by deed from Wm. A. D. Bounds and wife, dated August

21st, 1837, and recorded in Liber G. H. No. 9, folio
230, and describing the lands conveyed therein as parts
of patented tracts called, respectively, 'Covington's
Meadow,' 'Comfort's Adventure,' 'Father's Care,' 'Mid-
dle,' 'Comfort,' and 'The Lot'; which said land was
afterwards upon the death of John Kirwan laid off
and divided by a Commission appointed by the Circuit
Court for Somerset County, the proceedings of which
said Commission is duly recorded among the Judicial
Records of Somerset County in Liber L. W. No. 1 Judi-
cials, folios 240 *et seq.*, and all the said land conveyed
by the said Commissioners, viz: Levin Ross, Wm. A.
D. Bounds, Geo. Jones, and Wm. F. W. Miles, to said
John Robert Bloodsworth by deed made the 3rd day
of February, 1866, and recorded in Liber I. W. No. 9,
folios 440, etc. (some of the heirs of the said John Kir-
win having already granted their interests in the said
land to said John R. Bloodsworth).

"Third—That the land mentioned in the certificate
of said Alpheus B. Murray and Wade Bloodsworth
is the same or a part of the same land now owned and
in the possession of your caveator by virtue of the last
will and testament of her husband, John R. Bloods-
worth; that it is the same land or a part thereof which
the said John R. Bloodsworth acquired by virtue of
the said deed from the said Commissioners to lay off
and divide the land of John Kirwan, and by virtue of
deeds from the heirs or some of the heirs of said John
Kirwan, and also the same land or a part thereof which
the said John Kirwan acquired by the said deeds from
Ellicott Kirwan, and from John Kirwan, Sr., and
others; and also being the same or a part of the same
lands included in several patents as aforesaid, viz: Cov-
ington's Meadow, Comfort's Adventure, Father's Care,
Middle, Comfort, and The Lot; which issued out of
the Land Office of Maryland long before the filing of
said certificate by said Alpheus B. Murray and Wade
Bloodsworth. That it has never since escheated to the

State, therefore the State has no right, title or interest to grant.

"Fourth—That the said caveator and those under whom she claims, is now and for a long time, so long that the mind of man runneth not to the contrary, has been in open, exclusive, continuous, and uninterrupted possession of the said land, and has always and does now pay taxes thereon to the County Treasurer of Somerset County, there being now as has always been 104 acres of marsh land assessed to the caveator on the tax assessments books of Somerset County, on which your caveator does now and has for over 30 years paid taxes, both county and State, which said 104 acres of marsh land includes the land mentioned in said certificates of said Alpheus B. Murray and Wade Bloodsworth.

"Fifth—Because before the issuing of the warrant under which the alleged survey of 'Murray and Bloodsworth's Island' was made, this caveator and those under whom she claims has been in the open, exclusive, adverse, continuous and uninterrupted possession of the land mentioned in the said certificate filed herein by the said Alpheus B. Murray and Wade Bloodsworth, for more than twenty years."

The answer of caveatees filed August 2nd, 1920, denies the allegations of paragraph one of caveat; denies the allegations of paragraph two and three of caveat that the land mentioned and described in the certificate for "Murray and Bloodsworth Island" is the same land or any part thereof which was conveyed by the deeds mentioned in said paragraphs, and avers that the tract of land conveyed by the aforegoing deeds begins at the mouth of Sassafras Gut and is located north of said gut, and that the land mentioned and described in said certificate begins near the mouth of Sassafras Gut, is located south thereof, and lies between said gut and Monie Creek; it further avers, in answer to said paragraphs, that the land mentioned in said certificate is not the same land or any part thereof which was laid off and divided upon the death of the

said John Kirwan by commissioners appointed by the Circuit Court for said county and sold by said commissioners to the said John Robert Bloodsworth, and afterwards conveyed by said commissioners to said Bloodsworth, and that it is not the same land or any part thereof which was conveyed unto the said Bloodsworth by deeds from the heirs or some of the heirs of John Kirwan; but that so much of said land so sold and conveyed to Bloodsworth by said commissioners and others as is located south of the county road as shown on the plat and described in the certificate of survey filed in said judicial proceedings does not extend to or bind upon the waters of the Sassafras Gut or Monie Creek, and does not adjoin the land or any part thereof mentioned and described in the certificate for "Murray and Bloodsworth's Island"; and further avers that the said Bloodsworth did not own the land mentioned and described in said certificate or any part thereof and did not devise or attempt to devise said land or any part thereof to the caveator or to any one else; it denies the allegations of the fourth paragraph of the caveat that the caveator, or those under whom she claims, is now and for a long time has been in open, exclusive, continuous and uninterrupted possession of the land mentioned in said certificate or any part thereof, or ever paid taxes thereon; it denies the allegations of the fifth paragraph of the caveat that, before the issuing of the warrant in this case, the caveator and those under whom she claims have been in the open, exclusive, adverse, continuous and uninterrupted possession of the land mentioned in said certificate for the past twenty years, and avers that said land is an enclosed, unimproved parcel of marsh land and that such use, if any,' as said caveator or those under whom she claims have made of said land within said period of time has been in common with the public generally.

On October 7th, 1920, the commissioner passed an order setting the caveat down for hearing on November 12th, 1920, and directing the surveyor of Somerset County to lay down any lands which by either party he might be directed to lay

down to illustrate the matter in dispute, and that depositions be taken before a notary public or the examiner of the Circuit Court, on five days' notice, to be read in evidence on the hearing of said caveat, "provided, that in case of depositions taken on the part of the caveator, a copy of this order be served on the defendant at or before the serving of the subpoena in this case issued."

Testimony taken before a special examiner appointed in these proceedings was filed November 27th, 1920.

Caveator offered the will of John R. Bloodsworth, by which he devised to his wife, the caveator, during her widowhood, "all the real estate I may die possessed of, with all the improvements thereon," dividing said real estate amongst his children in remainder.

The caveator testified she was the widow of testator and the owner and possessor of the real estate devised by him, and had been for twenty years.

There were also offered the following: Patent of "Covington's Meadows"; patents of "Comforts Adventure"; deed from Robert Leatherbury, sheriff, to John Kirwan; deed from Richard Ingersoll to Jacob Kirwan; deed from Jacob Kirwan to Elliott Kirwan; deed from Elliott Kirwan to John Kirwan; deed from John Kirwan, Sr., to John Kirwan, Jr.; deed from the commissioners to divide the John Kirwan lands to John R. Bloodsworth.

Caveatees objected to the above patents and deeds as evidence because they had not been located "and for other reasons."

It appears from the evidence that the caveator was one of the children of John Kirwan, Jr., and that the land conveyed by the commissioners to John R. Bloodsworth were those which the said Bloodsworth elected to take in right of his wife.

Caveator testified the land was patented as "Comforts Adventure" and "Covington's Meadows"; that she never heard of her title to the marsh land between the two thoroughfares

being disputed "until six years ago somebody tried to take a piece of it away, but I proved it was mine," this was Mr. Foxwell; she sent for Mr. Tull and the surveyor; that her husband had the land enclosed about thirty-five years ago; they used the marsh for turning the stock and for a pasture; that it has been used for this purpose by her and her ancestors ever since she was big enough to know anything, and now her son-in-law, Reve Simms, keeps his stock in there. "When the stock law came in force we couldn't turn the stock out, and we had to fence it"; that no one had ever used the marsh between the thoroughfares without her permission. On cross-examination the witness said she did not mean to say that the piece of marsh around Monie Creek between the two thoroughfares was ever fenced in, because it is fenced by the two thoroughfares; the fence was further up towards the county road.

Isaac Kirwan, seventy-six years old, a brother of caveator, testified that he had known the marsh land in dispute for sixty-five years. It was owned by his father, John Kirwan. His land extended from Wicomico River to Great Monie Creek; that Sassafras Gut, when he was a boy, was what is now called the Upper Thoroughfare and empties into the Great Monie Creek; John R. Bloodsworth bought out all the heirs of John Kirwan, and showed witness the lines many times; he showed him the line running from the Sassafras Gut down to the mouth of the Great Monie Creek and the west line on the westward thoroughfare running from a flood gate to the Great Monie Creek; he had known the strip of land between the thoroughfares ever since he could remember anything; was born and raised on the farm; there was hardly a night in the summer that he wasn't on it after the cattle; the cattle would go as far towards Monie Creek as they could get; wire fences enclosed the land leading down to each of the thoroughfares; when the fence law came it had to be enclosed; has been enclosed about thirty-five years or more; Mr. W. McGrath went there and rented the pasture to keep his cattle in, on this same piece of marsh all inclosed.

George Alfred Bloodsworth, seventy-four years old, second cousin to caveator's husband, testified that he had known the strip of marsh land between the thoroughfares about fifty years; the caveator has been the owner and possessor of it during that time; the peninsula has been enclosed by fence about twenty-five or thirty years; the east wire fence ran down to the marsh until it hit the thoroughfare, and the west fence about the same "until it backed the cattle until they couldn't get through the thoroughfare"; witness pastured it for about a year five or six years ago with caveator's permission; the marsh which he pastured extended down to Monie Creek; witness also rented this marsh from John R. Bloodsworth about forty years ago, it was not then enclosed or used for pasture; witness used it for trapping muskrats.

On cross-examination witness said probably forty years ago people, without the knowledge of Bloodsworth, trapped the marsh, because then they went pretty much where they pleased; witness pastured the marsh between the thoroughfares five or six years ago. In answer to the question "Has that marsh between the thoroughfares ever, in your recollection, been fit for pasture?" witness said: "Yes, sir; cattle from the whole place always pastured on it. I have waded over there many times to drive them off."

George B. McIntyre, fifty-eight years old, testified he had known the property in dispute for forty-five years. Bloodsworth and his wife had owned and possessed it ever since he had known it; never heard any kick before as to the ownership of it; has heard all his life and his father told him several times that his old grandfather's (Capt. Jack Kirwan's) line ran from Monie Creek to Wicomico River.

S. Pritchett, forty-eight years old, has known the marsh thirty years. In answer to the question "What acts of ownership or occupancy or possession, if any, have you seen in your life exercised over this piece of marsh land between the two thoroughfares by John R. Bloodsworth or his widow?" answered: "They have always claimed it, trapped it and pas-

tured it." "Q. Have you ever been over the lower end of the marsh between the thoroughfares? A. Down on the end of it; yes, sir. Q. What is the condition of it, high or boggy? A. There is some boggy parts and then there is some that is solid." Witness further testified on cross-examination, that there was a time fifteen or twenty years ago when anybody that wanted trapped most anywheres as not much attention was paid to marsh land; that Mr. Foxwell trapped it more than any one else; thinks he has seen him trapping it within the last ten years.

John R. Simms, thirty-four years old, grandson of caveator, has lived on part of the property all his life; has known the piece that lies between the two thoroughfares ever since he was a tot running around with his grandfather. "Q. During your memory, who has owned, occupied and possessed this strip of land between these two thoroughfares? A. My grandfather, John R. Bloodsworth, and Mrs. Virginia Bloodsworth, my grandmother. Q. By what acts, if any, of theirs have they occupied and possessed it during your memory? A. They have had it in possession ever since I can remember. My grandfather always told me that it was his marsh, that he could walk from Wicomico River to Great Monie Creek without getting off his land. When I was a lad five or six years old I used to run cattle out of there for my grandfather and father. Q. Did these cattle have a range to Monie Creek? A. Yes, sir. Q. State whether or not this piece of land is enclosed now and, if so, how long has it been inclosed, and by whom this inclosure was kept up? A. It has been inclosed by my father, R. P. Simms, my grandfather, John R. Bloodsworth, ever since I was five or six years of age to my knowledge. Q. For whom did your father inclose it? A. He helped grandfather enclose it. Q. Has any one, to your knowledge, ever trespassed upon it? A. Yes, sir. Q. Who has trespassed upon it? A. Mr. Foxwell for one, that is about all I know of. Q. How long ago was that? A. It has been about ten years ago. Q. What was done about it? A. Nothing at all, I be-

lieve in 1914 Mr. McIntyre run him out of there from setting traps.   Q. Do you know where Sassafras Gut is?   A. I know what my grandfather told me Sassafras Gut was, that is what is called the Upper Thoroughfare now.

William Henry Jones, Earl McIntyre, R. P. Simms, Mrs. Emma Simms, James R. McIntyre and John Sam Jones gave practically the same character of testimony as the above.

Earl McIntyre rented the marsh from Mrs. Bloodsworth. Had trouble with Mr. Foxwell and Mr. Joe Dashiell; had to get a writ out for them for trapping and also for taking traps away; has seen Mr. Simms' cattle pasturing on this piece of marsh.   On cross-examination this witness said, in answer to question whether Foxwell was ever convicted under the writ, "He would have been if I had enforced it, because Mr. Tull went to us and asked us what we wanted to do about it; we told him, as he had such a large family, we would not have anything else done with him and we dropped it right there."

R. P. Simms, sixty-nine years old, married caveator's daughter; about forty years ago he moved up there to live by Capt. Bloodsworth, who was using this marsh to pasture his cattle and hogs; witness asked his permission to put his things in there, and he gave it.   "I told him I would" run one side of the fence down from the county road to the creek, if he would run the other side.   He ran the east side down to the creek and witness ran the westward side down to the creek, and witness has used the marsh ever since.   The marsh is enclosed by the thoroughfares and the fences.

On cross-examination witness said, in answer to the question whether the fence on the west side goes as far as the flood gate: "There is a bank that goes down to the flood gate; I don't remember if her fence goes down to the flood gate or not; there is a big bank that goes down there."

The following witnesses testified for caveatees:

B. Hayes Foxwell, forty-five years old, formerly lived on adjoining farm to that now owned by caveator.   Owned it for

about six years and lived there about twenty-two years, from about 1895. The farm on which he lived was known as the Samuel Street property. His father bought it from the heirs of Samuel Street. Witness used the piece of marsh land on Monie Creek between the two thoroughfares for nineteen or twenty years trapping muskrats, without permission from John R. Bloodsworth or his widow; rented from John R. Bloodsworth the piece of marsh back of the woods that joins this, at the time he was trapping the marsh now in dispute. The two pieces joined together. Doesn't know whether Bloodsworth knew he was trapping the lower piece; none of the Bloodsworths interfered with him; William Henry Jones was working with witness at that time and helped him trap. "Q. How is the marsh land between the thoroughfares located with respect to the Street farm which you once owned? A. It lies south of it. Q. How is Mrs. Bloodsworth's property located with respect to the Street property? A. The land is just to the eastward. Q. Then, as I understand you, the marsh between the thoroughfares lies south of the Street property, and not south of the Bloodsworth property? A. Not unless the lines have been changed since I owned it."

It will be seen that the last two answers of this witness are inconsistent with his previous statement that the piece of marsh he rented from Bloodsworth joined the piece now in dispute. "Q. Did you ever at any time have any talk with him about the outlines of his land? A. Yes, sir; I asked him where they were at. Q. What did he tell you? A. He told me he run down the ditch until he got between him and I to a hard strip of marsh running to the Upper Thoroughfare."

Witness trapped the marsh the last year he lived there about five years ago; it is very low and boggy; never saw any cattle pasturing between the two thoroughfares; it is too low and boggy to be pastured; not much different now from when he first knew it, it may be a little lower; the fences stopped at least a half mile from Monie Creek.

Alpheus B. Murray and Wade Bloodsworth, the caveatees, and B. P. Bloodsworth and L. J. Murray also testified that

the marsh between the thoroughfares was too boggy to pasture and that the fences did not run down within a half mile of Monie Creek.

. Thomas Stewart testified that about 38 years ago when he was a boy he trapped the marsh for just a little while with a man named J. W. Murrell; did not see any cattle pasturing on it; he was only there in the winter season and a very few times.

The plats made by Hall, the County Surveyor, for caveator, and by Polk for caveatees, and their testimony in reference to locations, were properly disregarded by the commissioner, as there was practically no actual survey made by either of them.

The commissioner seems to have disregarded the former patents offered in evidence because they were not located by surveys for the purposes of this case. We think reference in these patents to natural boundaries made them evidence, and as the land therein is described as lying on the north side of Great Monie Creek, this, with other testimony in the case, is a strong indication that the land in dispute is contained within the bounds of those patents; and, if so, it is not necessary that it should be within the lines of caveator's property in order that her caveat should be sustained. See *Patterson* v. *Gelston,* 23 Md. 446. But in the view we take of the case it is not necessary to decide the question of record title.

The caveator, in our opinion, has made out a good title by adverse possession, and about as complete as would be possible considering the character of the land. While there is evidence that Foxwell for a considerable time trapped this marsh without permission, it is not shown that this was open and hostile; and it does not appear that he protested or asserted any right even when a writ was issued against him. There is certainly no evidence that the use of the marsh by the caveator and those under whom she claims was in common with the public generally. The only use by others was such as was formerly common on all marshes by trespassing trappers.

As was said in *Sadtler* v. *Peabody Heights Company of Baltimore City,* 66 Md. 5, although it is necessary that the possession be an actual, hostile, notorious, exclusive and continuous possession, "in determining the question whether one has an actual possession of property, we must take into consideration its character and locality, and the uses and purposes for which it is naturally adapted; for the possessory acts over an outlying and uncultivated piece of land, may be proved by acts of ownership somewhat different from what will be required in regard to land under enclosure and in actual cultivation."

We think the commissioner erred in dismissing the caveat and granting the patent. It is not necessary to pass specifically on the many objections to testimony. They have been given careful consideration and the evidence properly objected to has been excluded in reaching our conclusion.

*Order reversed, with costs to appellant.*