**John Delbert STELLER and Mary A. Steller, his wife, Plaintiffs,**

**v.**

**Lee Woodkeeper DAVID and Anna A. David and Mary F. David, his wife; Miss Nora David; and Mrs. Hilda David Kemp and Dudley Kemp, her husband, Defendants.**

Superior Court of Delaware.

New Castle.

July 30, 1969.

Albert W. James and George C. Hering, III, of Morris, James, Hitchens & Williams, Wilmington, for plaintiffs.

Thomas G. Hughes, of O'Donnell, Hughes & Lowicki, Wilmington, for defendants.

STIFTEL, President Judge.

This is an ejectment action. It concerns marshland in Blackbird Hundred to which plaintiffs claim they received title by deed from Eleanor Brynberg Johnson on August 5, 1946. Defendants argue that the 1946 conveyance to the Stellers was a nullity because they claim their father, James Harry David, had acquired this land considerably before this time under the doctrine of adverse possession. This marsh tract, known as Tract No. 2, borders the Delaware River. Plaintiffs insist that it consists of 163 acres, more or less, and defendants claim it is 111 acres. The description in the surveys of 1911 and 1925 indicates it is more probably 111. Prior to the conveyance to the Stellers, it had been in the Johnson family at least from the year 1801. There was and is a companion Johnson tract, known as Tract No. 1, four or five hundred yards to the west, which consists of some 601 acres, some 160 acres of which is fast land and the remainder of which is marshland.

These two tracts stayed in the Johnson family and finally vested in one Dr. Robert P. Johnson, who was born October 11, 1828, and died June 16, 1890. When he died, only 28/60ths of the total fee could be traced to him. In other words, when Dr. Johnson died, he had clear title to a little less than one-half of Tract No. 2. Dr. Johnson died intestate and left his wife, Susan Elizabeth Bird Johnson, and two living daughters, Louisa Bird Johnson and Eleanor Brynberg Johnson.

During 1892, shortly after the death of Dr. Johnson, James Harry David occupied Tract No. 1 under verbal agreement with Dr. Johnson's widow, Susan. His son, Lee Woodkeeper David, was born there in 1894, and another son, Wilson Armstrong David,

in 1902. Some twelve years after Dr. Johnson's death, his widow, using a warranty deed, conveyed Tract No. 2 to James Harry David on September 8, 1902. The deed itself gave no indication that it was only for her life. However, at the time of the conveyance of Tract No. 2, this was the only interest she had in the land. Her two daughters had the remainder interest. At the time of this conveyance by Susan Johnson, Tract No. 1 still remained hers. It was not affected by the Tract No. 2 deed to James Harry David.

At about the time he received the deed to Tract No. 2, James Harry David purchased two other tracts of marshland immediately below Tract No. 2, in which he apparently took the fee. These three tracts became known as the River Tract, which comprised 326¾ acres and is mentioned in surveys in 1911 and 1925 as the David Lands.

Susan Johnson died on September 21, 1910, intestate. Her daughters, Louisa Bird Johnson and Eleanor Brynberg Johnson, inherited Tract No. 1, where James Harry David admittedly remained as a tenant under a rental-sharecropping arrangement: Food products on the farm land and muskrats[1] on the marshland of Tract No. 1.

Even though Susan Johnson's life estate terminated on September 21, 1910, in Tract No. 2, James Harry David, the life tenant for Susan's life, continued to use this land for hunting, muskratting, and cutting salt hay. He would use this land only for three or four months of the year because its special use limited its activity from December through March of each year. James Harry David paid the taxes on Tract No. 2 and apparently his heirs never stopped paying the taxes down to the present time. In the meantime, Louisa, who apparently had an undivided one-half interest in Tract No. 1 and Tract No. 2 as a consequence of the intestacy of her father, died on December

1. The verbal agreement provided that one-half of the monies earned from the sale of muskrats would be paid to the trappers whom David hired. David and Miss Johnson each received one-quarter from the remaining one-half.

14, 1926, leaving all of her land to her surviving sister, Eleanor Brynberg Johnson. It is from Eleanor Brynberg Johnson that John Steller and Mary Steller obtained their deed to Tracts Nos. 1 and 2 on August 5, 1946.

As formerly mentioned, James Harry David had been a long time resident of Tract No. 1. In fact, approximately two years after Dr. Johnson died, he moved onto Tract No. 1 in 1892 as a tenant of Susan Johnson. Ten years later, in 1902, he received the warranty deed from Susan as aforesaid. In 1911, one year after Susan died and the life tenancy terminated, James Harry David had a survey made of the three parcels of the River Tract. This is called the "Johns Survey". In 1925, James Harry David still on Tract No. 1 had another survey made of the entire River Tract. This is called the "Vandegrift Survey". In 1929, James Harry David decided to leave Tract No. 1. He moved to Smyrna, Kent County, Delaware, and one of his sons, Lee Woodkeeper David, took over as the sharecropper of the Johnson Tract No. 1. James Harry David often returned to the farm and continued a close business relationship with his sons. Lee Woodkeeper David remained on the Johnson Tract No. 1 until March 1, 1947, after Eleanor Johnson sold it and Tract No. 2 to the Stellers, on August 5, 1946, for a purchase price of $30,000.

During the period of time before the Steller deed, the senior David and his sons almost yearly entered upon Tract No. 2 and hunted and trapped there. They set markers along Tract No. 2 for the purpose of guiding trappers and they also sharecropped with individuals with whom they associated and to whom they gave permission to enter upon the River Tract.

Approximately a year after the conveyance to the Stellers, John Delbert Steller and Mr. MacClain, his tenant farmer, in December 1947,[2] placed and set some traps on the marsh. As fast as they were placed, however, Lee and Wilson David, right behind them, pulled them. Since it takes longer to set a trap than it does to pull one up, it was not long before the David brothers caught up with the trapsetters. It was then that Lee David told Mr. Steller that his father had a deed from Susan Johnson to the land, that he and his father continually paid taxes on the land and that they had made use of Tract No. 2 since 1902.[3] With these remarks, he continued 'pulling up the traps and threw them on Mr. Dukes' (an adjoining landowner's) side of the marsh. Lee and Wilson continued a close association with the Stellers over the years, but apparently they never heard from Steller again in reference to Tract No. 2 ownership until they and their sisters received a letter dated June 8, 1966, from Mr. Steller demanding that James H. David's children cease their trespass upon this particular tract.

Mr. Steller claims that he made no move after the December 1947 incident to reassert his ownership in Tract No. 2 primarily because he did not have the financial resources to engage in litigation and because his wife was a sister of the wife of Lee Woodkeeper David and he did not want any dissension in the family. However, in 1966, he was advised by counsel that something had to be done about protecting his rights in the land. This litigation followed on July 11, 1966.

▮ Title to realty may be acquired in Delaware by continuous adverse possession for 20 years. 10 Del.Code § 7901; Marvel v. Barley Mill Road Homes, 34 Del.Ch. 417, 104 A.2d 908; Jones v. Short, Del., 77 A. 968; Doe, dem. Pepper v. Pepper, 2 Marv. 221, 43 A. 90; Woolley, On Delaware Practice, § 1589, p. 1081. Possession is adverse when it is asserted in an open, notorious, hostile and exclusive manner for the

---

2. Wilson David remembers the date of this incident to be December 1948 or 1949. However, the other witnesses, including John W. Dukes, the adjoining landowner, say it was December 1947.

3. Lee Woodkeeper David made this statement. However, the facts indicate that his father had entered upon the land in 1892 and that Lee Woodkeeper David was born to his parents in 1894 while they were living on the tract.

twenty year period. Marvel v. Barley Mill Road Homes, supra; Reed v. Short, 5 Terry 103, 57 A.2d 90. "Open and notorious" means that the possession must be public so that the owner and others have notice of the possession. If possession was taken furtively or secretly, it would not be adverse and no title by adverse possession could be acquired. O'Daniel v. Baker's Union, 4 Houston 488, 503. "Hostile" means against the claim of ownership of all others, including the record owner. Delaware Land and Development Co. v. First and Central Presbyterian Church, 16 Del.Ch. 410, 147 A. 165, 179; DeCola v. Bochatey, 161 Colo. 95, 420 P.2d 395, 397. "Hostile" does not mean that the adverse possessor display a subjective evil intent or emotion against the title owner. The adverse possession must be one that is "exclusive" of the record owner and the public. Brown v. Hurley, 243 N.C. 138, 90 S.E.2d 324, 326; Burby on Real Property, § 111, p. 273.

■ What acts will characterize possession of an adverse possessor as "actual possession" depend on the facts of the particular case, the nature and location of the property, the uses to which it can be applied, and the surrounding circumstances. Bartholomew v. Edwards, 1 Houst. 17 and 1 Houst. 247; Suplee v. Eckert, 39 Del.Ch. 143, 160 A.2d 590; Truitt v. Osler, 4 Boyce 555, 90 A. 467, 472; Price v. Humble, Tex. Civ.App., 152 S.W.2d 804, 812; 4 Tiffany, Real Property (3d Ed.) (1967 Cum.Supp.), § 1138. Such acts of ownership as would be required in one case would not be required in another. If the disputed land is tillable, it might be reasonable to expect that acts of farming would be performed by one claiming to be the owner by adverse possession. If the land is wooded, it might be reasonable to expect the claimant-owner to cut timber at times. Truitt v. Osler, 4 Boyce 555, 90 A. 467, 470; Clark v. Hill, 1 Harr. 335. In other words, only such possession can be expected and exercised over the land as is practicable. Possession of marshland contemplated by law is that which is commensurate with its nature, its chief value measured by the extent of operations conducted thereon which its character and surroundings may reasonably permit. Acosta v. Nunez, (La.App.) 5 So.2d 574, aff'd 203 La. 275, 13 So.2d 860; Tiffany, Real Property, supra, § 1138, p. 282. If the chief value of the acreage is trapping muskrats in season, such evidence for the required statutory time may under proper circumstances be sufficient possession to establish ownership adversely. See Bloodsworth v. Murray, 138 Md. 631, 114 A. 575, 22 A.L.R. 1450; Reed v. Short, 5 Terry 103, 57 A.2d 90, 93.

■ Plaintiffs rest their claim on the title by deed dating from their grantor, Eleanor Johnson, back through her descendants. Reed v. Short, 5 Terry 103, 57 A.2d 90; Doe ex dem. Bright v. Stephens, 1 Houst. 31. Defendants, then, had the burden of establishing their title by adverse possession, when confronted with this proof. Doe ex dem. Barrett v. Jefferson, 5 Houst. 477, 478; Woolley, On Delaware Practice, § 1589, p. 1081. This burden must be satisfied by a preponderance of the evidence. Jones v. Short, Del., 77 A. 968.

■■ Ordinarily, it would seem that defendants made out a reasonably strong case to support their claim of title by adverse possession beginning at the time of the death of Susan Johnson in 1910. The fact that James Harry David legally possessed Tract No. 2 as a consequence of the legal life estate which he acquired from Susan Johnson would not prevent him at the proper time from claiming adversely at the termination of this life estate. 5 Thompson, On Real Property, 1957 Replacement, Sec. 2548. Nor would a mistaken belief as to the legal estate conveyed by the 1902 deed foreclose him from holding adversely after that date, for the issue is whether the elements of adverse possession have been satisfied. Marvel v. Barley Mill Road Homes, supra; Suplee v. Eckert, supra; Layton v. Pittard, 38 Del.Ch. 291, 150 A.2d 329; French v. Pearce, 8 Conn. 439; 6 Powell, Real Property, Ch. 91, p. 721.

It would appear that James Harry David's payment of taxes on Tract No. 2 would ordinarily be considered an act of ownership.[4] Doe ex dem. Wedderburn v. Roe, 5 W.W.Harr. 229, 162 A. 515. Also, the fact that James Harry David had two surveys made of the River Tract which included No. 2 was indicative of his claim of ownership. His staking of the northern boundary to guide the trappers he hired was an act of ownership as was his cutting of salt hay when it was practicable to do so. It is likely that the disputed tract was known as the David Marsh because he openly was the one who apparently controlled it. No trapers were hired by Miss Johnson but only by him and by Lee Woodkeeper David, his successor occupant. All of these facts, and others, would ordinarily indicate a strong case in favor of defendants because of the inactivity of Eleanor Brynberg Johnson and the positive actions of the defendants.

Did defendants prove by a preponderance of the evidence that plaintiffs and plaintiffs' predecessor in title failed to exercise required acts of ownership in the disputed lands so as to prevent title being acquired adversely by James Harry David and his heirs?

There is no doubt but that the Davids occupied Tract No. 2 openly and notoriously. Their use of the land was well known throughout the area. Unquestionably, it was known by Eleanor Johnson and her sister Louisa. The question is, then, whether James Harry David's possession of the land was hostile and exclusive insofar as the Johnson sisters were concerned. The 1902 deed by Susan to James Harry David plays the major role in this case. It is generally assumed and there is a strong suggestion that as a consequence of this deed James Harry David believed that he acquired the fee to Tract No. 2. There is also a suggested inference that Susan Johnson intended to convey the fee. This is unknown. The Eighty Dollars consideration mentioned in the deed from Susan to David is not helpful since marshland in 1902 was

probably worth little and the life estate may have been worth about as much as the fee. The consideration mentioned in the deeds to the other two parcels of the River Tract are about the same as paid for Tract No. 2.

It is difficult to understand how James Harry David would not know that Dr. Johnson died intestate and that his widow possessed only an estate for her life. He knew of the existence of her two daughters. No-one knows whether they were approached in 1902 and requested to sign the deed. The Johnsons are dead and there is no-one to speak for them. We can't tell whether Louisa's estate included Tract No. 2 in her inventory or not. The inventory mentions that she left a farm "in Appoquinimink Hundred" valued at $6,000. Defendants have not satisfactorily shown that Tract No. 2 was not included in this description in the estate inventory. There is twice as much marshland on Tract No. 1 as farmland, but it was included by inference under the term farmland. Defendants have not established by a preponderance of the evidence that Louisa did not know of her part-ownership in Tract No. 2 at her death. Certainly, the 1946 deed from Eleanor Brynberg Johnson to the Stellers was strong evidence that Miss Johnson knew of her ownership in Tract No. 2. When she acquired this knowledge, we do not know, but at least at the time she signed the deed, she knew she owned both tracts. Defendants have not shown that she had no knowledge of ownership in 1910 or thereafter.

James Harry David at his death had a great deal of property. The River Tract was included in his estate's inventory. It was probably included as a consequence of the existence of the 1902 deed from Susan. There is no indication that the David children at the time of their father's death relied on the acquisition of the fee by reason of the doctrine of adverse possession. In fact, when Mr. Steller was chased from Tract No. 2 in 1947 by Lee Woodkeeper David, the latter indicated that he relied

---

4. The record indicates that Tract No. 2 was treated separately for tax purposes until 1938 and thereafter assessed as part of the River Tract, Tr. 170.

on the Susan Johnson deed for his claim of right.

We don't know what agreements, if any, existed between Lee Woodkeeper David and his brother and Eleanor Brynberg Johnson pertaining to Tract No. 2. We do know of the verbal agreement pertaining to Tract No. 1 that existed between them. We know that James Harry David and Lee Woodkeeper David were treated graciously by Eleanor Brynberg Johnson by the verbal agreement. Their relation seemed to be one of good friendship and bilateral trust. No written papers existed between them. It is doubtful that James Harry David would have ever occupied Tract No. 2 hostile to Miss Johnson's legal claim to the land if she had made such a claim.

As mentioned, James Harry David was not one who was ignorant when it came to land transactions. At the time of his death, he owned a substantial amount of land. It is difficult to believe that some time during his lifetime he did not know that he had failed to acquire the fee in Tract No. 2. No papers, except the deeds, exist which give any indication of intent. Only the acts already mentioned assist us in a limited way.

█ Eleanor Johnson was an infrequent visitor to the farm. Many people thereabouts thought the Davids not only owned Tract No. 2 but No. 1 as well. Miss Johnson kept the farm but seldom used it. She was totally dependent on the Davids for the management of the Blackbird property. No-one knows whether or not she permitted James H. David to use Tract No. 2 for the quarter of each year that he used it on the condition that he continue to pay taxes. We can't determine from the muskrat record books if James Harry David shared any of the catch from Tract No. 2 with Miss Johnson in any year. Defendants did not show that she did not receive a share of the

catch from Tract No. 2. There is no reason to assume that she did not.[5] Of course, if she did, this would be strongly indicative of a landlord-tenant relationship similar to the one that existed as to Tract No. 1 and antagonistic to the theory of acquisition of ownership by adverse possession. Defendants had the burden to establish that no landlord-tenant nor permissive relationship existed.

Eleanor Brynberg Johnson was admittedly in possession of the main tract. Should she not also be considered in possession of Tract No. 2, which was nearby and occupied by the same family that occupied and cared for Tract No. 1 through the years? The special circumstances of the close relationship between the Johnsons and the Davids cannot be ignored. It is difficult to believe that James H. David's possession of Tract No. 2 was hostile to Eleanor Johnson and exclusive of her. It makes little sense for this woman to convey Tract No. 2 to the Stellers in 1946 by warranty deed. It is unlikely that she would warrant to the Stellers at her financial risk that she had a fee simple title to Tract No. 2 if, in fact, she did not. If left out of the 1946 deed, it is unlikely it would have reduced the $30,000 purchase price by much.* Furthermore, it is difficult to understand why James Harry David said nothing after the conveyance to the Stellers. He was nearby in Smyrna. Shouldn't this transaction involving Tract No. 2 have been known to him at or about the time? Over the years, just what could the Johnson sisters have done to protect their interests in Tract No. 2, considering their close relationship to the Davids? Post notices against their own Tract No. 1 tenant? Fence No. 2 against their No. 1 tenant? Write letters demanding his non-use? See Truitt v. Osler, 90 A. 467, 471. There is a strong inference that if the Davids had permission to use No. 1, they also had permission to use No. 2.

---

5. Muskrat ledgers presented for the 1905–1947 period contain entries such as "Little Marsh" (R–10), "Big Stone" (R–15), "meadow" (R–15), and "Marsh 1" (R–19), which may or may not be places within the No. 1 Tract. While "River Marsh" is mentioned several times (e. g., R–12), this book does not show that Miss Johnson did not receive a share of the No. 2 catch.

* It is unfair to compare its present value since it is next-door to a contemplated oil refinery.

There are too many question marks present in the case and the doubts raised should weigh against the adverse claimants. It helps little for the defendants to claim for the period after Eleanor's deed in September 1946 since twenty years possession as required by the statute failed to materialize prior to the filing of this suit. The Stellers' claim was clearly made known by Mr. Steller in the 1947 marsh confrontation. Furthermore, evidence indicates that the Davids[6] did not trap No. 2 in the years 1958 through 1966.[7] A valid title by adverse possession cannot be based on any such interrupted use of the land in question. Doe, dem. Pepper v. Pepper, 2 Marv. 221, 43 A. 90; Woolley, On Delaware Practice, § 1583, p. 1081. The Stellers certainly never intended to relinquish ownership to Tract No. 2. They also paid county taxes on this tract from the time they acquired the deed down to date.

Defendants have not sustained their burden of proving title to the area in question[8] based upon their claimed adverse possession. Therefore, defendants are guilty of trespass. Ejectment of plaintiffs' land is ordered.

6. There is no evidence that the two female children of James Harry David—Miss Nora David and Mrs. Hilda David Kemp —ever possessed Tract No. 2 after the Stellers acquired deed to the tract.

7. L. H. David said there were no records of trapping from '57 and '58 until '66 and '67 (Trans. 91). See, also, Trans. 72, 77, 80.

8. The area in which Tract No. 2 is located was formerly designated "Appoquinimink Hundred" but is now know as "Blackbird Hundred".