**Willis PETERS, Appellant,**

**v.**

**JUNEAU–DOUGLAS GIRL SCOUT COUNCIL, Appellee.**

**JUNEAU–DOUGLAS GIRL SCOUT COUNCIL, Cross-Appellant,**

**v.**

**Willis PETERS, Cross-Appellee.**

**Nos. 1660, 1661.**

Supreme Court of Alaska.

March 15, 1974.

Avrum M. Gross and Randall J. Weddle, of Faulkner, Banfield, Doogan, Gross & Holmes, Juneau, for appellant, cross-appellee.

R. J. Annis, Juneau, for appellee, cross-appellant.

## OPINION

Before RABINOWITZ, C. J., and CONNOR and FITZGERALD, JJ.

CONNOR, Justice.

The property in dispute is a small section of breachfront in a protected cove of Tee Harbor, a semi-wilderness area near Juneau, Alaska.[1]  Record title to the property is held by the Juneau-Douglas Girl Scout Council.[2]  Claiming the property by adverse possession is Willis M. Peters, a 71 year-old Tlingit Indian.[3]

At trial, Mr. Peters stated that he first came to Tee Harbor when he was about eight years old.  However, his family's particular interest in the property involved in this dispute dates from 1916.  In the spring of that year according to Mr. Peters' testimony, his uncle Elijah Sharclane "bought the place" from one Henry Phillips for twenty-five dollars in gold.[4]  Before Elijah died, he asked his oldest brother, Jerry, to take care of the property after he "took off."  Similarly, when Jerry Sharclane felt he was getting too old to manage the property, he gave it to his nephew Willis Peters.  This transfer oc-

---

1. The Girl Scout Council holds title to a long, narrow 9.24 acre tract of beachfront property abutting Tee Harbor.  Mr. Peters claims only a fraction of this tract, a section 575 feet long in the middle of the tract.

2. Appellee Juneau-Douglas Girl Scout Council has been succeeded by and is now known as the Tongass-Alaska Girl Scout Council.

3. At the March, 1971, trial, Mr. Peters testified that he would be 71 years old on October 15.

4. Apparently what Elijah bought was not the land, but a house on the land, a building which he intended to and did use as a store.  Willis Peters, age 16 at the time, witnessed the purchase.  When asked whether when Elijah bought the building he got the land the building sat on too, Mr. Peters answered: "Well, I don't think it can go without it.  The house can't be up in the air.  I don't know about that one.  I can't answer it.  He bought the building for store, that is all I know."

The trial testimony seems to indicate, however, that what was informally transferred from Elijah to Jerry to Willis was not just the store building itself, but the whole area used by the family.  It is this wider area, on which the family over the years built several houses and other structures, that Mr. Peters now claims to have adversely possessed.

curred in about 1932. Mr. Peters described it as follows:

> "Well, he's [Jerry Sharclane is] getting pretty old and that is howcome he tell me I have to take care of it now, You're [*sic*] old enough to take care of it. That is howcome I got it, yes."

At the time Elijah purchased the building for his store, a community of Tlingit Indians occupied the area. A nearby cannery apparently ceased operation sometime in the 1920's, and the Tlingits gradually began to move away. By the time Jerry Sharclane gave the property to Willis, only Peters and his family remained on the land.

Over the 40 years since then, Peters has used the land in various ways. Although he has had a house in Juneau for "close to twenty" of those years and has only lived solely on the claimed property for the last five years,[5] Peters made regular and extensive use of the property throughout the 40-year period. While he lived in Juneau, according to his testimony, he drove out there every weekend. He lived on the Tee Harbor property off and on every year during seal hunting season.[6] A bench for scraping seal hides was built there. During the summers, he repaired boats there, his own and those of certain of his relatives. Throughout the period, Peters has worked to keep the beach area free of rocks so that it will be a good place to land his boats. He has used his boats for sealing and for fishing, returning to his land at Tee Harbor to process the seal and smoke the fish. In addition, Peters has used the property as a station from which he hunts deer. He has also dug clams and planted a somewhat unsuccessful garden on it. Apart from these rather numerous activities, there are several structures on the land which should have indicated Peters' occupancy to the record owners. The property is dotted with the remains of several cabins, some of them caved-in and abandoned now like Jerry Sharclane's, Tom Sharclane's, and Flora Rudy's.[7] Other structures appear to be still in use. These include the house Peters built on the site of Elijah's old store,[8] a platform with a tent on it which Peters testified he put up six years ago to store his boat motors and trolling outfit, a smokehouse put up "close to twenty years ago" for smoking fish and seal and deermeat, a seal skinning bench, and a well dug by Peters' sons.[9]

The boundaries of Peters' claim are marked on the southwest by the remains of Jerry Sharclane's cabin, on the north or northwest by a bronze or brass post and on the east by the shoreline. The bronze post marking the north boundary is a piece of air pipe given to Peters to mark the end of his claim and to replace other markers that had been knocked down. The marker post has been knocked down four times. Peters testified that the first post was put there before 1930. He further testified that the piece of pipe was given to him in "maybe 1935," and that he had a sign on it indicating his ownership of the prop-

5. In approximately 1966 Peters' house in Juneau was apparently taken over by the State Housing Authority, so Peters moved out to the property in question and began living permanently in his boat. The boat is on land above the high tide mark, not in the water. It rests in a cradle which Mr. Peters built for it.

6. According to Peters, he and his family "never stop seal hunting." They hunt "as long as the seal float." According to the testimony of one of Peters' sons-in-law who hunted with Peters every year from 1952 until approximately 1968, the seals float "[a]nytime before May and also after Octo-

ber." They hunted "off and on for about three months," spending nights in a cabin at Tee Harbor.

7. Flora Rudy is Willis Peters' mother. He lived in this cabin with his mother during part of his youth.

8. This house is the eighth one built on the site. The others were caved-in by winter snows and then rebuilt. It is not clear what this building is presently being used for, but apparently it is not inhabited by anyone.

9. Peters testified that the well was dug by his youngest son, Tom, and his adopted son, Daniel Moreno.

erty until someone threw the sign away. He testified:

"After Donohue gave me this pipe I attach a notice to it. I say this property owned by Willis M. Peters. Please don't pull this post away. We see it on the beach."

It is not clear when Mr. Peters first decided he should "get papers" for his property like other people had. But at some point, apparently through talking to people, he became aware that in order to protect his holding and preserve it for his children, he must acquire a written paper title.[10] He sought the help of many people in his search for these papers. He went first to Territorial Governor Ernest Gruening, and after that to Gruening's successors. He went to the Land Management Office and to Alaska Native Services. He talked to several people. At some point he was told that the land belonged to Nick Bez and that he should see Nick Bez about it. Nick Bez is apparently an official in the company that owned the cannery. Peters testified that in 1950 he and his wife went down to Seattle to see Nick Bez and were told to stay "right there" on the land because that was their home and the cannery no longer had any use for it. Peters stated that Nick Bez told them he, Bez, no longer owned it.[11] It was not until about 1969 that Peters learned that the Girl Scouts had title to the property.[12] Shortly thereafter, in January, 1970, Peters brought the present action seeking to establish his title to the property.

██ The case was tried by the superior court, without a jury. After hearing the evidence, the court found that Peters had satisfactorily shown that his use of the

---

10. Apparently Mr. Peters has desired for sometime to build a "good" house on the property, but wished to clear his title before doing so. Mr. Peters' understanding of the reason he needed papers on the property he claimed is indicated by the following excerpts from his trial testimony:

"Well, this is the point. This is the point. I could have built a house a long time ago but I ask Nick's man when the Nick's man tell me you have to have a title, you have to have something to show on it then I begin to think myself too about I better get title to it, I better get papers for it like a birth certificate. Something like that. . . .

. . .

"I want to clear everything before I build a house there, like what we are talking about now. Now what we gonna do if the Court hand it to me, we are going to get papers for it, surveyor papers or something to show, something my kids can show. Well, that is what I want. That is howcome I don't want to touch it. That is howcome I live in the boat.

. . .

". . . Well, this is the way. You have to have—you have to show papers. I realize that, you have to show papers, your title, that you own the place, you own the house or you own the boat like Coast Guard. You show it to the people, this is my boat, this is the number of it. That's what it mean. That's what it mean to me in my head in my mind."

11. The following interchange took place at trial between the attorney for the Girl Scouts and Mr. Peters:

"Q. [By attorney] Now, after he [Bez] told you that he didn't own it, then who did you believe owned it? Who did you think owned it?

A. [By Peters] The Thlingets. The Thlingets. He tell me himself, that place belong to your people. He asked me, how many of you live there now? All by myself and my kids."

12. Peters' discovery of this fact is described in the following excerpt of trial testimony:

"Q. [By attorney for Girl Scouts] When did you find out the Girl Scouts had an interest in this property.

A. [By Peters] I'm going to tell you. After all I knock everybody's door and this man start laughing at me, that Ed Neilson. You know that place is bought by Girl Scout. I said no, well howcome you never tell me? Well, the Girl Scout bought it 1940, '48 or something like that. Here you guy tell me to go down and see Nick Bez. That is a trick. That is quite a trick. Now suppose I do anything, I build a house over there why they burn my house up. Well, I didn't know anything about that. I tell him I don't know anything about it, honest to God I didn't know nothing. When the Girl Scout bought that place—tax or something. I don't know. I can't tell you that."

land was continuous, open and notorious for the ten-year statutory period.[13] However, the court further concluded that Peters had failed to prove that his use of the property was exclusive or that his possession was hostile. Hence, judgment was rendered against Peters and for the Girl Scout Council.

## I. EXCLUSIVITY

Contrary to the conclusion of the trial court, we find that Peters' use of the property was sufficiently exclusive to satisfy the requirements of adverse possession.

The exclusive use requirement is often defined quite similarly to certain of the other requirements of adverse possession.[14] This seems natural since the main purpose of nearly all the requirements is essentially the same, that is, to put the record owner on notice of the existence of an adverse claimant. That purpose should, therefore, be kept in mind when deciding whether any given set of circumstances satisfies the exclusive use requirement.

■ An owner would have no reason to believe that a person was making a claim of ownership inconsistent with his own if that person's possession was not exclusive, but in participation with the owner or with the general public. To deprive the record owner of his title, the adverse claimant's acts must "evince a purpose to exercise exclusive dominion over the property."[15] The "exclusive use" requirement is further described in 5 Thompson on Real Property § 2547 (1957 Replacement) as follows:

"It is necessary that the adverse claimant hold possession of the land for himself, as his own, and not for another. . . . In determining the exclusive character of the possession, the character and locality of the property and the uses and purposes for which it is naturally adopted are considered, and mere casual and occasional trespasses upon the land by a stranger are not generally considered as interrupting the continuity of adverse possession of land." (Footnotes omitted.)

■ In the present case there is no real indication that Peters and his family shared possession with anyone else. All the improvements to the property were made by Peters or his relatives. Peters testified that to his knowledge, no one in the last twenty years had actually stayed on the property other than his family and the people to whom he gave permission. During extreme low tides, the beach fronting on Peters' land as well as his neighbors' lands was often populated with numerous clamdiggers. Peters admitted that he never made any effort to keep those people off his beach because, as he put it, "I haven't got that kind of heart."

■ The only reason given by the trial court for finding that Peters had not proven exclusive use of the property was:

"Clamdiggers, picnickers, and others have certainly occasionally made use of the beach area off and on through the years, and not necessarily with permission of plaintiff or anyone."

There is no indication in the record of picnics on the property by anyone other than Peters and his family, nor is it clear who the "others" referred to by the trial

---

13. AS 09.10.030 states:
"No person may bring an action for the recovery of real property, or for the recovery of the possession of it unless commenced within 10 years. No action may be maintained for the recovery unless it appears that the plaintiff, his ancestor, predecessor, or grantor was seized or possessed of the premises in question within 10 years before the commencement of the action."
This statute not only establishes a time limit within which an action to recover real property must be brought, but also constitutes the method by which a claimant may establish a new title through adverse possession. Ayers v. Day and Night Fuel Co., 451 P.2d 579, 581 (Alaska 1969).

14. See, e. g., Family Land & Investment Co. v. Williams, 273 Ala. 273, 138 So.2d 696, 699 (1961) ; Gates v. Roberts, 350 S.W.2d 729, 732 (Mo.1961).

15. 5 Thompson on Real Property § 2547 (1957 Replacement).

court are.[16] In any case, occasional use of the beach by clamdiggers or other trespassers does not destroy the exclusivity of Peters' use. Total exclusivity is not required. In the words of the Oregon Supreme Court, a claimant's "possession need not be absolutely exclusive; it need only be a type of possession which would characterize an owner's use." Norgard v. Busher, 220 Or. 297, 349 P.2d 490, 496 (1960).

In Anderson v. Cold Spring Tungsten, Inc., 170 Colo. 7, 458 P.2d 756 (1969) the defendant adverse-possessors had used a cabin located on the disputed land on weekends and vacations during the summer. The trial judge found that, because the public used part of the property in question for picnicking, there was no exclusive possession of the property for the statutory period. The Colorado Supreme Court held that this was error, stating that

"[i]n order for possession to be exclusive, it is not necessary that all use of that property by the public be prevented. . . . In light of the nature of the property claimed by the defendants and in light of the nature of their use of the property as a vacation cabin, the record reveals that the defendants acted as the average landowner would act under such circumstances to assert the exclusive nature of their possession." 458 P.2d at 759.[17]

Perhaps even more to the point is the case of Pulcifer v. Bishop, 246 Mich. 579, 225 N.W. 3 (1929). The court there held that the defendant had established a claim by adverse possession to a portion of a beach even though the beach was commonly used by others for recreation without protest by defendant. The Michigan court stated:

". . . In view of the well-known tendency of people to make rather free use of shores and beaches, we think defendant exercised all control of these premises that reasonably could be expected in view of their character. . ." 225 N.W. at 4.

In the present case Willis Peters' use of the property in question was exclusive and not in common with the public generally. Occasional clamdiggers could not destroy the exclusive character of Peters' use since such casual intrusions were clearly not considered by Peters to interfere or conflict with his own use. In allowing strangers to come on the land to dig clams and in allowing friends, relatives and other members of the Tlingit tribe occasional use of the land, Peters was merely acting as any other hospitable landowner might. Appellee's implication that Peters held the land as steward or custodian for all the Tlingits of Alaska is not supported by the record. Rather, it appears that Peters held his land as any other landowner might, for himself and for his descendants.

## II. HOSTILITY

The trial court based its finding that Peters failed to satisfy the hostility requirement on its belief that Peters' possession was permissive and therefore subservient to the true owner's legal title. In so concluding, the trial court erred. We find that Peters satisfied the hostility requirement.

"The great majority of the cases establish convincingly that the alleged re-

---

16. The only contact of the Girl Scout Council with the property is noted in the following response to one of plaintiff's interrogatories: "The property was inspected from time to time by adult members of the Girl Scouts Council with a view to developing the property. It is also believed that some girl scouts used the area for overnight camping trips." No work has been done or improvements of any kind placed on the property by the Girl Scout Council.

17. See also McKelvy v. Cooper, 165 Colo. 102, 437 P.2d 346, 347 (Colo.1968) where it was held that casual intrusion by fishermen did not prevent the adverse claimants' possession from being exclusive or defeat their claim to the ranch land involved; and Bloodsworth v. Murray, 138 Md. 631, 114 A. 575, 579, 22 A.L.R. 1450 (1921), which held that use of marsh land pasture by trespassing trappers did not prevent a claimant from acquiring title to it by adverse possession.

quirements of claim of title and of hostility of possession mean only that the possessor must use and enjoy the property continuously for the required period as the average owner would use it, without the consent of the true owner and therefore in actual hostility to him irrespective of the possessor's actual state of mind or intent." [18]

■ The test for determining the existence of the requisite degree of hostility is a fairly objective one. The question is whether or not the claimant acted toward the land as if he owned it. His beliefs as to the true legal ownership of the land, his good faith or bad faith in entering into possession (*i. e.*, whether he claimed a legal right to enter, or avowed himself a wrongdoer), all are irrelevant. An early Minnesota case, Carpenter v. Coles, 75 Minn. 9, 77 N.W. 424 (1898), put it quite succinctly when it said:

"The misapprehension on the subject arises from the somewhat misleading, if not inaccurate, terms frequently used in the books to express this adverse intent, such as "claim of right," "claim of title," and "claim of ownership." These terms, when used in this connection, mean nothing more than the intention of the disseisor to appropriate and use the land as his own to the exclusion of all others. To make a disseisin it is not necessary that the disseisor should enter under color of title, or should either believe or assert that he had a right to enter. It is only necessary that he enter and take possession of the lands as if they were his own, and with the intention of holding for himself to the exclusion of all others." [19]

■ From the standpoint of the true owner, the purpose of the various requirements of adverse possession—that the non-permissive use be actual, open, notorious, continuous, exclusive and hostile—is to put him on notice of the hostile nature of the possession so that he, the owner, may take steps to vindicate his rights by legal action. Where the user has acted, without permission of the true owner, in a manner inconsistent with the true owner's rights, the acts alone (without any explicit claim of right or intent to dispossess) may be sufficient to put the true owner on notice of the nonpermissive use. Ottavia v. Savarese, 338 Mass. 330, 155 N.E.2d 432, 435 (1959). *See* American Law of Property § 15.4, at 771–785; Restatement of Property § 458, comments "a" and "d". "[T]he physical facts of entry and continued possession may themselves evidence an intent to occupy and to hold as of right sufficient in law to support the acquisition of rights by prescription." Ottavia v. Savarese, supra, at 435, citing Holmes v. Johnson, 324 Mass. 450, 86 N.E.2d 924 (1949).

"The intent with which the occupant holds possession is normally determined by what he does upon the land. [Citation omitted.] Where the land is used in the manner that an owner would use it there is a presumption that the possession is adverse. [Citation omitted.]" Springer v. Durette, 217 Or. 196, 342 P. 2d 132, 135 (1959).

■ The nature of Peters' possession in the present case has already been discussed. The court is satisfied that Peters acted toward the land in question as would an owner, taking into account the geophysical nature of this land and the reasonable uses for which it is suitable. Springer v. Durette, *supra,* at 134; 6 Powell on Real Property § 1018, at 740.

In spite of the trial court's conclusions, this court does not find that Peters' use either originated or continued under consent of the title holder. Peters believed his right to possession derived from his uncles, not from any acquiescence, consent or permission of the cannery or Nick Bez. The

---

18. American Law of Property § 15.4, at 776–777, quoted in Ottavia v. Savarese, 338 Mass. 330, 155 N.E.2d 432, 435 (1959).

19. *See also* 6 Powell on Real Property § 1015, at 725–6 and the mistaken boundary line cases cited therein, French v. Pearce, 8 Conn. 439 (1831), in particular.

fact, referred to in the trial court's memorandum opinion, that the owners of the cannery may have acquiesced in Indian occupation of the land during the cannery's operation is irrelevant. Whether the Indians predated the cannery or whether they moved onto the land after the cannery began operations, the cannery's mere acquiescence in their use of the land cannot constitute the kind of permission which would prevent the acquisition of title by adverse possession. The whole doctrine of title by adverse possession rests upon the acquiescence of the owner in the hostile acts and claims of the person in possession. Arkansas Commemorative Commission v. Little Rock, 227 Ark. 1085, 303 S.W.2d 569, 571 (1957).

The trial court also pointed to a conversation between Peters and Nick Bez, a representative of the record owner, which apparently took place in 1950. In that conversation, according to the trial court's interpretation, Peters "sought and obtained verbal permission to continue his use of the land." Our reading of the record does not agree with the trial court's on this point. Peters visited Mr. Bez not seeking permission for anything, but rather seeking a piece of paper. Having become convinced that he must get paper title to the property, he went in search of that magical piece of paper. In his efforts he visited the Governor, the Bureau of Land Management and others. He was told he had to see Nick Bez before anything could be done. Nick Bez apparently told him "you stay right there, we can't use it no more . .." Peters testified that "Nick Bez tell me you stay right there, that is your home because he knows it himself." The word "permission" came up only on cross-examination. It was not Willis Peters' word. After being asked several times if he had asked Nick Bez if he could stay on there, (to which Peters answered in the affirmative each time) Peters was asked: "Did he [Bez] give you permission to stay there?" Peters answered "yes". Taken out of context this might support the analysis of the trial court. However, Peters' testimony as a whole reveals that he considered himself as owner and not as a permissive user. Peters visited Nick Bez seeking a piece of paper, a deed, a title so that he could build a house on the land without fear of losing it. He wanted papers to show, papers his "kids" could show.

But, whether Peters thought the land was legally his or Nick Bez's or the cannery's or the Girl Scouts' is not controlling. What is more important is that he at all times acted as if the land were his and treated it as his.

In earlier cases we have noted that "[W]hen one enters into possession or use of another's property, there is a presumption that he does so with the owner's permission and in subordination to his title."[20] This presumption is, of course, rebutted by the adverse claimant's showing that he was not on the property by permission and establishing that the record title holder could have ejected him from possession throughout the statutory period. This, Mr. Peters has done.

We may set aside a finding of fact of the trial judge only if it is clearly erroneous. Ayers v. Day and Night Fuel Co., 451 P.2d 579, 582 (Alaska 1969); Civ. R. 52(a). "A finding is clearly erroneous when, although there may be evidence to support it, we are left with the definite and firm conviction on the entire record that a mistake has been committed." Alaska Foods, Inc. v. American Mfr.'s Mut. Ins. Co., 482 P.2d 842, 848 (Alaska 1971). In the present case, however, our decision depends primarily upon the validity or invalidity of the trial court's legal analysis, not its factual findings. The content of a particular legal doctrine, and what the facts of this case establish under such doctrine is the central issue in the case. Ap-

20. Hamerly v. Denton, 359 P.2d 121, 126 (Alaska 1961); Ayers v. Day and Night Fuel Co., 451 P.2d 579, 581 (Alaska 1969).

pellant Peters does not for the most part seek a reweighing of the evidence, but rather a reversal for failure to apply the proper standard of law. On questions of law, this court is not bound by the lower court's view and, consequently, we do not apply the "clearly erroneous" standard of review.

The Girl Scouts' cross-appeal alleges error by the trial court in granting Mr. Peters' motion for an extension of time in which to file his notice of appeal. This allegation is without merit. The trial judge did not abuse his discretion in granting the extension based on a showing of excusable neglect in learning of the entry of judgment by Peters' counsel.[21]

The judgment of the superior court is reversed, and the case is remanded for entry of judgment in favor of appellant.

Reversed and remanded.

ERWIN and BOOCHEVER, JJ., not participating.

---

**21.** Alaska Rules of Appellate Procedure, Rule 7(a) (formerly Alaska Supreme Court Rule 7(a)).