**BENTLEY FAMILY TRUST, BANK OF CALIFORNIA, National Association, Co-Trustee, and Clifford C. Burglin, Co-Trustee, Appellant/Cross-Appellee,**

v.

**LYNX ENTERPRISES, INC., Irene Noyes, Canna Smith Phipps, her heirs, successors or assigns and all other persons, known or unknown claiming any interest in the Complaint, adverse to Plaintiffs' ownership, or any cloud upon Plaintiffs' title thereto, Appellee/Cross-Appellant.**

No. 6015/6038.

Supreme Court of Alaska.

Jan. 21, 1983.

Peter J. Aschenbrenner, Aschenbrenner & O'Meara, Fairbanks, for appellant/cross-appellee.

J. John Franich, Jr. and Mary A. Nordale, Law Offices of Mary A. Nordale, Fairbanks, for appellee/cross-appellant.

Before BURKE, C.J., MATTHEWS and COMPTON, JJ., and DIMOND, Senior Justice.*

## OPINION

DIMOND, Senior Justice.

This appeal concerns an action to quiet title to real property in Fairbanks. The suit was instituted by Bentley Family Trust (BFT) in 1979 against Lynx Enterprises, Inc. (Lynx), Irene Noyes (Noyes), and all other interested parties. For the convenience of litigating the various claims, the disputed property was divided into ten parcels by the court. The parcels are collectively bounded on the east by the Old Steese Highway, on the north by U.S. Survey 848 (land owned by BFT), and on the west by the Noyes Slough. The southern boundary is marked by Tract B of the Graehl Townsite.

After a hearing on the parties' cross-motions for summary judgment in December 1980, Judge James R. Blair issued a final judgment quieting title to all ten parcels. The parties have appealed the court's ruling as to Parcels II, III, IV, and VIII.

BFT has challenged the court's ruling as to Parcels IV and VIII, claiming that the superior court erred by rejecting its claim of adverse possession and instead quieting title in the record owners, Noyes and Lynx. Upon review, we conclude that the activities conducted by BFT on Parcel IV from 1963 to 1973 do establish its adverse possession as a matter of law.[1] We therefore reverse the court's ruling in part and quiet title to Parcel IV in BFT. For reasons stated below, we affirm the court's judgment quieting title to Parcel VIII in Lynx.

On cross-appeal, Noyes has challenged the entry of summary judgment against her and in favor of BFT as to Parcels II and III. We reject Noyes' contentions that BFT failed to conclusively establish the requisite continuity and activity to establish adverse possession and that the superior court considered inadmissible evidence in arriving at its decision. We therefore affirm the superior court's judgment quieting title to Parcels II and III in BFT.

The facts of this case are complicated by the numerous parcels of land, parties, and legal theories involved. Although many

---

* Dimond, Senior Justice, sitting by assignment made pursuant to article IV, section 11 of the Constitution of Alaska, and Alaska R.Admin.P. 23(a).

1. It is well established that summary judgment is proper only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Alaska R.Civ.P. 56(c). In reviewing a summary judgment, all reasonable inferences must be drawn against the movant and in favor of the nonmoving party. E.g., *Williams v. Municipality of Anchorage,* 633 P.2d 248, 250 (Alaska 1981); *Clabaugh v. Bottcher,* 545 P.2d 172 (Alaska 1976).

facts bear on issues concerning the claims to all four of the disputed parcels, for the purpose of clarity our review will be divided into two sections. The first section will focus on the dispute concerning Parcels IV and VIII. The second section will cover the dispute concerning Parcels II and III.

## I. PARCELS IV AND VIII

The area of land that formerly constituted the Old Slough (the slough) was divided into six parcels by the court. The north half of the slough was designated as Parcels I, IV, and VIII.[2] The superior court quieted title to Parcel I in BFT under a riparian rights analysis,[3] but rejected BFT's claim of adverse possession as to Parcels IV and VIII. Instead, the court quieted title in the record owners, Noyes and Lynx.

BFT's claims of adverse possession as to Parcels IV and VIII are based on identical activities conducted during the ten-year period from 1963 to 1973. Because a finding of adverse possession depends on the particular circumstances in each individual case, we find it necessary to review the activities relating to Parcels IV and VIII in considerable detail.

## A. FACTUAL BACKGROUND

During the early 1960's, Pruhs and Fivey, Inc. (Pruhs) operated a restaurant on property which was situated along the southern edge of the slough. Pruhs leased this property, along with the adjoining south half of the slough, from William Woodcock. During the summer of 1961 or 1962, Pruhs began filling in the area of the slough leased from Woodcock for use as a parking lot.

In 1963, Pruhs made arrangements to lease the north half of the slough (Parcels I, IV, and VIII) from the Bentley brothers (predecessors-in-interest of BFT) in order to expand the area of the proposed parking lot. Under the terms of its lease with the Bentleys, Pruhs was to contribute the cost of the fill in lieu of paying cash for rent.[4] The lease from the Bentleys ran from 1963 through 1968, a period of five years.

In 1968, after the Pruhs lease expired, Woodcock took over operation of the restaurant and continued to use the filled area as a parking lot. At that time the Bentleys began constructing a fence along the north bank of the filled-in slough. Woodcock complained about the fence, claiming that it might present a hazard to patrons of his restaurant. Woodcock's attorney discussed the matter with the Bentleys, and Woodcock subsequently entered into a lease with the Bentleys for the same portion of the slough bed that had been previously leased by Pruhs (Parcels I, IV, and VIII).

The lease between the Bentleys and Woodcock was executed on July 10, 1968, and was to run through 1973, a period of five years. The lease contained a holdover clause which provided that any continued occupancy by the tenant after the expiration date was to be regarded as a month-to-month tenancy. Woodcock paid rent under the lease through June 30, 1973,[5] although

---

**2.** The south half of the slough was divided into Parcels V, VI and X and its ownership is no longer in dispute.

**3.** The slough was a nonnavigable waterway subject to the rule that riparian owners along nonnavigable streams own all the land underneath the stream up to the center or thread of the stream. *Bourgeois v. United States,* 545 F.2d 727 (Ct.Cl.1976). Similarly, AS 09.25.-040(4) provides that when a nonnavigable stream is the boundary of a parcel of property, the rights of the grantor to the thread of the stream are included in the conveyance, except where the road or bed of the stream is held under another title. As record owner of land bounded by the slough, BFT holds title to Par-

cel I, the adjoining land up to the centerline of the waterway.

**4.** In 1963, when Pruhs had dumped enough gravel in the south half of the slough to reach the watercourse at the middle of it, he estimated that 10,000 cubic yards of gravel would be required to completely fill it in. Pruhs was quoted a price of $4,000 for the gravel under a special arrangement; otherwise the fair market value of fill would have been $15,000.

**5.** According to George H. Bentley's Federal Estate Tax Returns, Woodcock paid rent for the north half of the slough as follows:

1968 — $300
1969 — $600
1971 — $600

he continued in possession until 1974. In 1974, Woodcock sold the restaurant and his adjoining land (the south half of the slough) to Lynx and in 1975 he executed a quitclaim deed to Lynx for the entire slough area.

The lease between the Bentleys and Woodcock was recorded in 1977 and the terms of that arrangement are undisputed. However, no documents have been produced evidencing the lease agreement between the Bentleys and Pruhs. Instead, BFT has submitted a certified transcript of a prior court hearing as evidence of the Bentley-Pruhs lease. The transcript is of a preliminary injunction hearing held in 1963 before Judge Rabinowitz in Fairbanks and includes testimony by Pruhs, Woodcock, and the Bentleys as to the ownership of the slough.

The court action, referred to as the Fairbanks Lanes hearing,[6] was initiated in 1963 while Pruhs was in the process of filling in the slough. The owners of the Fairbanks Lanes Bowling Alley, as upstream neighbors, protested the filling in of the slough claiming that it would obstruct drainage of their property. The bowling alley sought to enjoin the owners of the slough property from filling it in and filed an action in superior court naming Woodcock and Pruhs as co-defendants. Woodcock was named because he was the record owner of property which bordered the south half of the slough (on which the restaurant was located) and because he claimed ownership of the south half of the slough as well.

During the course of the hearing, George Bentley was called as a witness on behalf of the defendants, and Woodcock's attorney examined him as to his ownership of the slough and adjacent lands. Bentley testified that he had leased the north half of the slough to Pruhs, with the lease boundary running down the centerline of the slough. Bentley also testified that the lease with Pruhs had been under consideration for a couple of years before it was consummated.

Don Pruhs testified as a corporate officer of Pruhs and Fivey, and described the terms of his leases with both Woodcock and Bentley. Pruhs referred to the lease with Bentley as running to the "middle of the slough" and pinpointed the dimensions of the leased property. At the conclusion of the hearing, Judge Rabinowitz ruled that Woodcock and Pruhs did have the right to fill in the slough where the same existed on their property.

The record owners of Parcel IV and Parcel VIII, Noyes and the City of Fairbanks,[7] took no part in the Fairbanks Lanes litigation nor in the filling in of the slough. Moreover, the record is devoid of evidence of any activities or interest exhibited by Noyes or the City as to the slough property from 1963 to 1973.

## B. ADVERSE POSSESSION

■ Alaska has two statutes relating to adverse possession. Under AS 09.25.050, when possession is under "color of title" the statutory period is seven years.[8] In other cases, AS 09.10.030 provides a ten-year statutory period.[9] However, under either statute, the claimant must satisfy the basic

---

There is a final entry of $350 for the period November 21, 1972, to June 30, 1973.

6. The action was formally titled *Fairbanks Lanes, Inc. v. William J. Woodcock, Pruhs and Fivey, Inc., John Doe Fivey, Donald Pruhs, Does 2–4*, No. 63–336 Civ. (Alaska Super., 4th Dist., Fairbanks, 1963).

7. The City of Fairbanks was the record owner of Parcel VIII from 1952 until 1976 when it conveyed its interest to Lynx.

8. AS 09.25.050 provides:
   The uninterrupted adverse notorious possession of real property under color and claim of title for seven years or more is

conclusively presumed to give title to the property except as against the state or the United States.

9. AS 09.10.030 provides:
   *Actions to recover real property in 10 years.* No person may bring an action for the recovery of real property, or for the recovery of the possession of it unless commenced within 10 years. No action may be maintained for the recovery unless it appears that the plaintiff, his ancestor, predecessor, or grantor was seized or possessed of the premises in question within 10 years before the commencement of the action.

elements of adverse possession in establishing his or her claim. *Alaska National Bank v. Linck,* 559 P.2d 1049 (Alaska 1977). *See also Shilts v. Young,* 567 P.2d 769 (Alaska 1977); *Peters v. Juneau-Douglas Girl Scout Council,* 519 P.2d 826 (Alaska 1974).

■ In *Linck,* 559 P.2d at 1052, we set forth the required elements establishing a claim of adverse possession. These elements include: (1) the possession must have been continuous and uninterrupted; (2) the possessor must have acted as if he were the owner and not merely one acting with permission of the owner; and (3) the possession must have been reasonably visible to the record owner.

■ Because BFT does not claim to hold title to the parcels in dispute, it must show evidence of satisfying the above required elements for a period of at least ten years under AS 09.10.030.[10]

PARCEL IV

■ The evidence submitted by BFT in support of its claim of adverse possession of Parcel IV is not in dispute. Instead, summary judgment was granted against BFT because of the superior court's determination that the facts on the record were insufficient to establish BFT's possession as a matter of law. Our review of the facts convinces us that the superior court was mistaken.

We find that BFT's possession through its lessees, Pruhs and Woodcock, satisfied the first requirement of continuous and un-interrupted possession for the requisite ten-year period. There is no evidence that BFT's claim to Parcel IV was effectively interrupted by third parties or the record owner from 1963 to 1973. Instead, the Bentleys were recognized as having a superior interest in Parcel IV and accordingly entered into consecutive leases with Pruhs and Woodcock.

Noyes does not dispute the existence of the Bentley leases from 1963 to 1973, but instead argues that the Bentley-Pruhs lease is supported by inadmissible evidence. Noyes contends that BFT's claim of adverse possession must therefore fail because it can only be based on the five-year period of Woodcock's lease. We note, however, that the superior court properly overruled Noyes' objection to admission of the Fairbanks Lanes hearing transcript.[11] Although details of the lease agreement between Pruhs and the Bentleys are not well documented, it is nevertheless undisputed that Pruhs' actual possession of the slough property was in subordination to the Bentleys' superior interest.

We also reject Noyes' theory that Woodcock interrupted BFT's exclusive possession of Parcel IV when he complained about the Bentleys' construction of a fence on the slough property. As Powell states: "When the interference with the possessor's possession consists of some act of a third person, unrelated to the true owner, it seldom constitutes an interruption of possession; and this result is assured when the possessor acts with diligence to protect his possession

10. This statute not only establishes a time limit within which an action to recover real property must be brought, but also constitutes the method by which a claimant may establish a new title through adverse possession. *Peters v. Juneau-Douglas Girl Scout Council,* 519 P.2d 826, 830 n. 13 (Alaska 1974). As we recently stated in *Curran v. Mount,* 657 P.2d 389, 391 (Alaska, 1982), "A party claiming title to real property by adverse possession must bear the burden of proving each element by clear and convincing evidence."

11. The use of supporting material on a motion for summary judgment is governed by Civil Rule 56. The question of whether a certified transcript of court proceedings may be relied upon for summary judgment has not been specifically considered by this court. However, under Federal Rule 56, upon which the Alaska rule is based, "a court may consider ... certified transcripts of a court or administrative record proceedings" upon a motion for summary judgment. 6 J. Moore, Moore's Federal Practice § 56.11, at 56–203 (2d ed. 1982). The use of certified transcripts has been permitted under the rationale that they are equivalent to affidavits in terms of their evidentiary value, and in light of the ancillary safeguards associated with their preparation. *Fletcher v. Bryan,* 175 F.2d 716, 717 (4th Cir.1949). *See Shulins v. New England Ins. Co.,* 360 F.2d 781, 785 (2d Cir.1966).

against such act." R. Powell & P. Rohan, The Law of Real Property § 1040, at 719 (1977) (footnote omitted). The Bentleys' action in constructing a fence after the Pruhs lease came to an end shows that they acted diligently to protect their claim of exclusive right to Parcel IV.

The Bentleys' behavior satisfied the second requirement that an adverse possessor act as if he owns the land rather than as if he is merely on the land with the permission of the true owner. *Shilts v. Young,* 567 P.2d at 776; *Linck,* 559 P.2d at 1053; *Peters v. Juneau-Douglas Girl Scout Council,* 519 P.2d at 830. The Bentleys' actions in leasing the property [12] and excluding others from the land when their interest was threatened were clearly acts of ownership.

The third and final requirement for establishing adverse possession is that the possession be reasonably visible to the record owner. In *Peters v. Juneau-Douglas Girl Scout Council,* 519 P.2d at 832, we noted:

> From the standpoint of the true owner, the purpose of the various requirements of adverse possession—that the nonpermissive use be actual, open, notorious, continuous, exclusive, and hostile—is to put him on notice of the hostile nature of the possession so that he, the owner, may take steps to vindicate his rights by legal action.

The test is not whether the true owner in fact knows of the adverse possessor's activities, but whether the owner can be charged with such knowledge. *Id.*

In addition to imputing such knowledge, courts generally recognize that community repute, as well as physical visibility, is relevant evidence that the true owner has been put on notice. *Linck,* 559 P.2d at 1053. In this regard, we note the facts that (1) Woodcock recognized the Bentleys' superior claim to the property when he entered into the 1968 lease, and (2) the Bentleys were called in to testify at the Fairbanks Lanes hearing when a dispute arose concerning the slough property. These facts provide evidence that third parties also recognized the Bentleys' claim as to the north half of the slough.

We conclude that as a matter of law, a duly alert record owner of the slough would be charged with notice that the slough was filled with some thousands of yards of tailings, was compacted and graded, and was being used day and night for parking automobiles. If Noyes, the record owner of Parcel IV, had had occasion to visit her property during the period under which BFT claims adverse possession, she would clearly have observed the activity of strangers on her land. In addition, if Noyes, or any other party, had inquired of Pruhs or Woodcock as to the ownership of the property between 1963 and 1973, the only reasonable inference that can be drawn from the record is that he or she would have been informed that the north half of the slough was "claimed" and/or being leased by the Bentleys.

In light of the foregoing, we conclude that the superior court erred in quieting title to Parcel IV in Irene Noyes. We reverse that part of the court's judgment, and hold that BFT has established title to Parcel IV by adverse possession.

## PARCEL VIII

Although BFT conducted the same activities on Parcel VIII that we now find constitute its adverse possession of Parcel IV, a different outcome is mandated because the City of Fairbanks was the record owner of Parcel VIII during the period under which BFT claims adverse possession. BFT's claim must fail because AS 29.73.030 provides that a municipality may not be divested of title to real property by adverse possession. The City of Fairbanks therefore retained ownership of Parcel VIII until 1976 when it conveyed its interest to Lynx. We accordingly affirm the court's judgment quieting title to Parcel VIII in Lynx.

## II. PARCELS II AND III

Parcels II and III are referred to as "the triangle property" because the exterior di-

---

12. Leasing in itself has been held to be an adverse use. *Family Land & Inv. Co. v. Wil-liams,* 138 So.2d 696 (Ala.1961); *Hatch v. Munden,* 117 Wis. 428, 94 N.W. 332 (1903).

mensions of both parcels taken together roughly form a triangle. The southwest side of the triangle lies along the north bank of the slough (adjacent to Parcel IV) and the southeast side is bounded by the Old Steese Highway (highway). The northern side, or base of the triangle, is bounded by BFT's property, U.S. Survey 848.

Irene Noyes was the record title holder to the triangle property when BFT commenced this action. Noyes acquired the property in 1941 as part of a larger conveyance from her then husband, Sherman, and recorded the deed in 1945. The majority of the property acquired by Noyes was located to the east of the highway, while the portion constituting the triangle property was to the west of the highway. Noyes subsequently developed and sold all of her property to the east of the highway, establishing the Timberland Subdivision. However, she engaged in no real property transactions with respect to the triangle property from 1945 to 1978, a period of thirty-three years. Because of BFT's varied activities on the property over the years, the superior court determined that BFT had established adverse possession of the triangle property and accordingly quieted title in BFT.

## A. FACTUAL BACKGROUND

From 1931 to 1948 the Bentley family owned and operated a dairy on their land adjoining the triangle property. When Noyes first moved to the area in the late 1930's, she observed the Bentley cows grazing "across the Steese [highway]." The cows were a constant nuisance to Noyes because they often crossed the highway, trampled her garden and bothered her children. After Noyes acquired title to the property in 1941, she and her husband, Sherman, complained about the cows and actually informed the Bentleys that they held title to the land the cows were grazing on. The Bentleys refused to recognize Noyes' claims, however, insisting instead that the triangle property was theirs. Noyes and her husband even attempted to

trade a corner of their land to the Bentleys to even off their property, but met with no success because the Bentleys "wouldn't agree to anything."

The dairy discontinued operations in 1948, and the next documented use of the triangle property occurred in 1955 [13] when the Bentleys leased a portion of their land, together with a portion of the triangle property, to the Steese Corporation for use as a trailer court. The lease was recorded in 1956, and provided for a fifteen-year term. The original lease did not run its full term, however, but was replaced in 1965 with a new fifteen-year lease for the term 1965 to 1980.

The Steese Corporation went into possession of the leased property in 1956 or 1957 and constructed a bathhouse, driveways, and spaces for trailers. The activities of the trailer court are well-documented by the Department of Health and Social Services, Division of Public Health (the Department), which licensed its operation. The Department made numerous visits to the property over the years for the purpose of correcting health hazards resulting from the trailer court's activities. The Department's records, which include correspondence, licenses, and miscellaneous documents, evidence some sort of activity by the owners of the trailer court for each year from 1956 through 1970, a total of fifteen consecutive years.

The lease for the trailer court was cancelled in 1976 in order to permit the development of a Fred Meyer retail store. The store was to be located on an area of land that included property owned in record title by BFT as well as the triangle property. Fred Meyer subsequently entered into ground leases with BFT for the undisputed portion of the property and with Noyes for the disputed portion pending the outcome of this litigation. BFT made it clear to Noyes that its acquiescence in Noyes' lease agreement with the developers did not constitute an approval or surrender of any rights of BFT, but was rather to the mutual

---

**13.** The only use of the triangle property claimed by Noyes took place during the late 1940's and early 1950's when her children had a playhouse on the triangle property.

benefit of all parties so that the building could be constructed first, with title litigation to follow.

## B. ADVERSE POSSESSION

After reviewing the record of BFT's activities on the triangle property over the years, we hold that the superior court was correct in its finding that BFT adversely possessed the property from the record owner, Noyes. Although the court failed to specify the exact ten-year period upon which it based its finding under AS 09.10.-030,[14] we believe its judgment can be sustained by the Bentleys' adverse possession of the property through their lessees from 1957 to 1967.[15] The activity of the trailer court's operators during these years is well-documented and satisfies the three requirements of adverse possession set forth previously. *Linck,* 559 P.2d at 1052. Specifically, we find that (1) the Bentleys' possession was continuous and uninterrupted, (2) that the Bentleys acted as if they were the true owners of the land, and (3) that their possession was sufficiently notorious so as to put the true owner, Noyes, on notice of their claim. *Id.* at 1052.

The Bentleys clearly acted as the true owners of the triangle property by leasing the property for use as a trailer court. They held themselves out as owners and were recognized as such by third parties.[16]

The requirement of notoriety is satisfied by the construction of the trailer court in 1955 or 1956 and the existence of trailers on the property thereafter. Moreover, in the instant case, Noyes has admitted that she was actually aware of the trailer court's construction in 1956 or 1957. Nevertheless, she took no steps to protect her interest in the property and did not challenge the proprietor's right to operate the trailer court.[17]

Noyes argues, however, that even if the Bentleys' activities during the requisite period were sufficient to constitute adverse possession, the court erred by awarding the entire area known as the triangle property to BFT. Noyes points out that the Bentleys' recorded lease to the trailer court operators encompassed only that area designated as Parcel II. (In fact, it is precisely for this reason that Noyes requested separate designations for Parcels II and III.) Therefore, Noyes maintains that title to Parcel III, the "sliver" of land[18] between the area described in the lease and the slough, should remain vested in her as the record owner.

Noyes' contention is based on the well-established principle that only property actually possessed by the claimant during the whole statutory period may be acquired by adverse possession. *Walsh v. Emerick,* 611 P.2d 28 (Alaska 1980); *Shilts v. Young,*

---

14. *See* note 9 *supra.*

15. We emphasize that our reasoning does not conflict with the superior court's judgment and that our findings are based on the undisputed facts in the record. *Cf. Totem v. Alyeska Pipeline,* 584 P.2d 15, 24 (Alaska 1978); *Davis v. Hallet,* 587 P.2d 1170, 1171 (Alaska 1978); *Ransom v. Haner,* 362 P.2d 282, 285 (Alaska 1961) (on appeal, supreme court will not disturb proper result regardless of reasoning employed below); *Moore v. State,* 553 P.2d 8, 21 (Alaska 1976) (supreme court may affirm trial court's grant of summary judgment if alternative grounds exist for upholding its judgment). Alaska R.Civ.P. 56.

16. As previously noted, evidence which suggests that the claimant was regarded by the community as the owner of the disputed property is relevant to the true owner's notice of the claim. *Shilts v. Young,* 567 P.2d at 776; *Linck,* 559 P.2d at 1053. See text, section I–B *supra.*

17. Noyes testified in one of her two depositions that the trailer court had "sprung up" while she was away for six months in 1955. When questioned as to her knowledge of the trailer court's authority to operate on the land, the following exchange took place between Noyes and BFT's counsel, Peter Aschenbrenner:

Q. Okay. Do you know who it was that told these trailer court people in 1955 that they could go onto that property?
A. No.
Q. Do you know if it was the Bentleys?
A. Do I—do I know if it was the Bentleys?
Q. Yes.
A. No. I—I—
Q. Do you suspect it was the Bentleys?
A. Well, it seemed to be theirs. I mean, is where the [cows] used to be.

18. Parcel III encompasses only 1257 square feet.

567 P.2d at 772. We agree that BFT could acquire title to only Parcel II if our finding of adverse possession was based on the terms of the written lease to the trailer court alone. The superior court specifically refuted this contention, however, and we find that the lease description is not conclusive of the actual area possessed by the Bentleys' lessees while operating the trailer court.

Other than the technical description in the lease, the record reveals that no distinctions in use were in fact made between different portions of the triangle property. It is noteworthy that the participants in the 1963 Fairbanks Lanes litigation consistently referred to the trailer court property as running up against the property leased by Pruhs (the north half of the slough or Parcel IV). More importantly, there is no basis in the record for assuming that Noyes herself was aware of any invisible line dividing what she commonly referred to as the property "across the Steese [highway]". In actuality, the highway to the east and the slough to the west provided easily identifiable natural boundaries marking the triangle property and were treated as such by the parties involved.

In light of the foregoing, we conclude that the superior court was correct in its determination that BFT established adverse possession of Parcels II and III.

The trial court's judgment quieting title to Parcels II and III is therefore AFFIRMED. For the reasons set forth in Section I of this opinion, the court's judgment quieting title to Parcel VIII in Lynx Enterprises is also AFFIRMED. The court's judgment quieting title to Parcel IV in Noyes, however, is REVERSED with instructions to quiet title in BFT.