# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CHRISTINA A. BOGIA, MELISSA R. )
BURKE, JOHN S. MALLOY III, JOHN C. )
CHEBAN, VIRGINIA CHEBAN, )
ROBERT A. DELLE DONNE, )
MICHELLE DELLE DONNE, WILLIAM )
J. ORGA, LAUREN A. ORGA, )
and PAUL A. RATH, )
                           )
         Petitioners, )
                           )
     v.                        )   C.A. No. 2018-0135-MTZ
                           )
ALBERT W. KLEINER, JR., )
                           )
         Respondent. )

## MEMORANDUM OPINION

Date Submitted: May 23, 2019
Date Decided: August 8, 2019

William P. Brady, The Brady Law Firm, P.A., Wilmington, Delaware, *Attorney for Petitioners*.

John R. Weaver, John R. Weaver Jr. P.A., Wilmington, Delaware, *Attorney for Respondent.*

**ZURN, Vice Chancellor.**

A collection of neighbors asks the Court to interpret deed language allowing the shared use of a driveway for "driveway purposes." The driveway runs behind several private residences, and also allows customers to access commercial storage garages that sit behind the homes. Although the current and previous homeowners used the driveway for many purposes through the years, the current owner of the storage garages has not allowed the homeowners to park their cars in the driveway, place their trash cans[1] there for pickup, or use the space for recreational activities. To enforce this new view, the owner of the storage garage towed the homeowners' automobiles and asked the City of Wilmington to discontinue trash pickups in the driveway.

This litigation followed. The parties completed trial in December 2018. Having considered their evidence and post-trial submissions, I conclude that at least one of the homeowners has an easement that includes parking, trash pickup, and non-disruptive recreational activities. That homeowner has also proven the elements of adverse possession for a thin strip of land at the rear of her property.

I. BACKGROUND

The facts recited in this post-trial opinion are the Court's findings based on the record presented at trial. That record includes the pleadings, the parties' exhibits,

---

[1] The plaintiffs' complaint references "trash and trash cans and recycling receptacles on the driveway for pick up by sanitation trucks." Docket Item ("D.I.") 1 ¶ 39. I refer to all such receptacles as trash cans.

and testimony of three witnesses at trial.[2]  The following facts were either uncontested or proven by a preponderance of the evidence.

### A.    The Relevant Properties

The property at 717 South Scott Street, Wilmington, Delaware, is a commercial parcel consisting of thirty garages that customers rent for personal storage.[3]  Customers access those garages via a driveway that nearly surrounds 717 South Scott Street.  Anyone can access the driveway from one of three entrances: one from Beech Street on the north side of the block, and two from South Scott Street on the east side of the block.  There is no direct access to the driveway or garage from South Lincoln Street to the west, or Oak Street to the south.  The driveway abuts the back of residential homes, which surround all four sides of 717 South Scott Street.[4]  The parties provided satellite view and parcel maps of the relevant area for reference:[5]

---

[2] The trial transcript is available at D.I. 17.  Citations to testimony presented at trial are in the form "Tr. at # (X)" with "X" representing the surname of the speaker, if unclear from the text.  I refer to the parties' joint exhibits submitted for trial as "JX."  The parties agreed to submit the exhibits into evidence at trial.  Tr. at 31-32.

[3] Tr. at 99 (Kleiner).

[4] The driveway to the north of the garage on the Beech Street side is not at dispute.

[5] JX 1 & 2.







717 S. Scott Street, Wilmington, DE 19805

New Castle County Delaware GIS: http://gis.nccde.org
Disclaimer: For informational purposes only - not to be used as official documentation.

In 1946, West Side Development Company sold most of the block, including

the land on which 717 South Scott Street and many of the surrounding homes would

eventually be built, to Agostino Fortunato.[6]  That transaction is memorialized in a deed dated February 14, 1946 (the "Fortunato Deed").[7]  The Fortunato Deed described the driveway by reference to the surrounding streets.[8]  The deed conveyed

> TOGETHER with the free and uninterrupted right, use and privilege of the aforesaid driveway, in common with others entitled thereto forever; subject, however, to a proportionate share of the expense of keeping said driveway in good order and repair.[9]

In the 1940s, Fortunato developed the thirty-two houses that sit on South Lincoln, South Scott, and Oak Streets surrounding 717 South Scott Street.[10]  According to respondent Albert W. Kleiner, Jr., who presently owns 717 South Scott Street, twenty-eight of those homes were originally conveyed with language like the following:

> TOGETHER with the free and uninterrupted right, use and privilege of the hereinafter described 25 feet common driveway, as well as the other common driveway hereinafter described, in common with others entitled thereto forever, for driveway purposes.[11]

---

[6] D.I. 20 at 3; D.I. 21 at 3.

[7] JX 3.

[8] *Id*. at 402-03.  All page cites to deeds reflect the pre-printed page numbers if available.

[9] *Id*. at 403.

[10] Tr. at 17 (Bogia); D.I. 21 at 3.

[11] D.I. 21 at 3; *see* JX 9 at 255.

Fortunato died in 1970.[12] 717 South Scott Street was sold in 1973, 1993, and 1995.[13] Each time, the deed contained the nearly identical descriptions of the driveway and the "right, use and privilege" to use the driveway.[14] The deeds also made clear the property was "SUBJECT FURTHER to the rights of others entitled thereto to the free and uninterrupted right, use and privilege of the drive-way hereinafter described."[15]

In 2005, by a deed in lieu of foreclosure, Judy N. Kleiner came to own 717 South Scott Street.[16] That deed contained the same language identifying the driveways as previous deeds.[17] When Ms. Kleiner passed away in 2014, her son, respondent Albert W. Kleiner, Jr. inherited the property.[18]

The petitioners own some of the homes that surround 717 South Scott Street. Christina A. Bogia owns 710 South Lincoln Street.[19] Melissa R. Burke and John S. Mallow III own 713 South Scott Street.[20] John C. and Virginia Cheban own 707

---

[12] D.I. 5 ¶ 16.

[13] JX 4-6.

[14] JX 4 at 52; JX 5 at 81-83; JX 6 at 341, 343.

[15] JX 4 at 52; JX 5 at 83; JX 6 at 343.

[16] JX 7.

[17] It did so by including copies of pages of an earlier deed. *Compare* JX 7 *with* JX 6.

[18] Tr. at 98-100 (Kleiner).

[19] Tr. at 4; JX 8.

[20] Tr. at 77; JX 10.

South Scott Street.[21]  Robert A. and Michelle A. Delle Donne own 709 South Scott Street.[22]  William J. and Lauren A. Orga own 1809 Oak Street.[23]  Paul A. Rath owns 715 South Scott Street.[24]  Their deeds contain language granting the right to use the common driveway, though only Bogia's deed uses the term "driveway purposes."[25]  The parties did not provide the chain of deeds tracing each petitioner's current title to the original deeds.

Bogia and Burke testified at trial.  Bogia has owned her home since 1998.  She also resided at 720 South Lincoln Street between the ages of two and sixteen (between about 1963 and 1977).[26]  Burke purchased 713 South Scott Street in April 2016.[27]

## B.     The Residents' Use Of The Driveway

Petitioners offered unrefuted evidence that from the 1960s through the 2000s, homeowners parked their cars in the driveway, the neighborhood children played in the driveway, and the city picked up the homeowners' trash from the driveway.

---

[21] JX 11.

[22] JX 12.

[23] JX 13.

[24] JX 14.

[25] JX 8 at 79; JX 10 at 3; JX 11 at 274; JX 12 at 96; JX 13 at 1; JX14 at 211; *see also* JX 23 (collecting deeds).

[26] Tr. at 6.

[27] Tr. at 87.

Bogia testified that going back to her childhood in the 1960s, "the kids all played back there. The cars parked back there. . . . The trash pickup was there. Even the milk truck came down [that] way back then."[28] During the 1960s and 1970s, Fortunato's daughter resided on South Lincoln.[29] She parked her car there and her trash was picked up in the rear of the home on the shared driveway.[30] After Bogia moved back to the neighborhood in 1998, those same uses continued. Bogia's son played with his friends in the driveway, and she parked her car there.[31] Petitioners submitted pictures from the 1990s and 2000s of homeowners and their guests using the driveway to park their cars and as a place for children to play.[32]

## C. Kleiner Inherits 717 South Scott Street And Curtails Use Of The Driveway.

After Kleiner inherited 717 South Scott Street, he changed the status quo. He hired a towing service and towed vehicles parked in the driveway.[33] Bogia's car was

---

[28] Tr. at 8 (Bogia); *see also id*. at 7 ("Q. How would you characterize that dispute? A. I guess, when I grew up, we played back there. We -- cars parked back there. It was very communal. And [Respondent is] not letting us park back there anymore."); *id.* at 8 (noting her understanding of "driveway purposes" to mean "kids could go back there and play, where cars could park back and forth, where cars could enter the garages, where the trash pickup came down."); *id*. at 13-15 (testifying about trash pickup dating back to 1960s); *id*. at 112 (Kleiner) (agreeing that City picked up trash behind homes).

[29] *Id.* at 17-18.

[30] *Id*.

[31] *Id*. at 18-19.

[32] JX 19.

[33] JX 20; Tr. at 29-30 (Bogia); Tr. at 126 (Kleiner).

towed four times.[34]  Before 2014, Bogia never had her car towed or received a notice not to park in the driveway.[35]

Parked cars can sometimes be in the way of both the residents and garage patrons: "[i]t's the city."[36]  But Kleiner never had to tow a car in order to allow a customer to access a garage.[37]  When a car blocked a customer, "somebody would say, 'Hey, can you move your car.  I need to get out. I need to get around.' You know, and people would just move their cars.  You would just knock on their door."[38]  As a result of Kleiner's actions, the residents use the driveway less than before.[39]

Kleiner also asked the City of Wilmington to stop picking up trash from the driveway.[40]  He did so "[b]ecause there was so much trash back there flying everywhere, trash cans flying everywhere when it was windy, and it was just cluttering up [his] property."[41]  In June 2017, the City of Wilmington's Department of Public Works notified residents that they would no longer conduct weekly pickups

---

[34] Tr. at 29.

[35] *Id*. at 19-20.

[36] *Id*. at 12-13.

[37] *Id*. at 125.

[38] *Id*. at 13 (Bogia); *accord, id.* at 125 (Kleiner).

[39] *Id*. at 126 (Kleiner).

[40] *Id*. at 112 ("And I wrote letters to these people regarding the trash, and it just came to a point where I asked the City if they could have the trash put out in front of their house instead of on my property.").

[41] *Id*.

9

in the driveway.[42]  The residents now must move their trash cans to the front of their homes.[43]  As a result, the Public Works truck "clogs up the traffic" on South Lincoln in the morning, including cars headed to a nearby high school.[44]

### D.  Bogia's Predecessor Fenced In Part Of The Driveway.

Bogia is also asserting a claim for adverse possession.  The back of her property, 710 South Lincoln Street, is fenced in.  The fenced-in area includes a strip of 717 South Scott Street that is approximately 25.07 feet wide by 1.2 to 1.7 feet.[45]  When Bogia moved into her home in 1998, the fence was a chain-link fence that dated to at least the 1960s.[46]  In 2005, she replaced the chain-link fence with a vinyl

---

[42] JX 15 ("The reason for this change is unavoidable.  The City was contacted and requested to terminate trash vehicles access to the alley by the owner of the property.").  The City does perform special pickups in the driveway when requested.  Tr. at 16-17 (Bogia).

[43] Tr. at 16.

[44] *Id.*

[45] D.I. 1 ¶ 60.

[46] Tr. at 21-22.  Bogia's personal knowledge of the fence only dates to the 1960s, and so I sustained objections at trial about her testimony concerning the fence being installed as "the original" fence in the 1940s.  *Id.* at 22-23.

fence.[47]  The vinyl fence was installed on the same location as the chain-link fence.[48]

Bogia uses the area inside her fence as a garden.[49]

In 2015, Kleiner hired a surveyor to survey the property and identify his property line.[50]  Through that survey, Kleiner learned for the first time that Bogia's fence was on his property.[51]  Kleiner's attorney sent a letter to Bogia dated March 16, 2015, which notified Bogia that the survey revealed her fence encroached on 717 South Scott Street.[52]  The letter continued, "In the interest of being a good neighbor, Mr. Kleiner recognizes that the encroachment exists and hereby gives his consent that your fence may remain where it is presently located, without prejudice to Mr. Kleiner, or his successors or assigns, to require removal at a later date."[53]  The letter

---

[47] *Id*. at 21-22.

[48] *Id*. at 23.  The survey appears to have revealed many of the fences belonging to the homes on South Lincoln Street were approximately 1.5 feet over the boundary.  JX 16.  None of the other owners have advanced a claim for adverse possession.  Bogia's new fence is aligned with her neighbors' fences, which are also beyond their property lines.  This alignment bolsters Bogia's testimony that her new fence is in the same location as the old fence.

[49] Tr. at 26.

[50] *Id*. at 102.

[51] *Id*. at 102, 111.

[52] JX 16 at 1.

[53] *Id*.

11

also addressed the driveway easement, warning Bogia not to park on the driveway or her car would be towed.[54]

### E. Petitioners Sue.

Petitioners sued Kleiner to enforce property rights they claim he violated. First, they seek a declaratory judgment that their deeds contain an easement for the use of the driveway. Second, they seek a declaratory judgment that the easement permits the City of Wilmington to perform trash pickup. Third, they request a permanent injunction preventing Kleiner from limiting, denying, or terminating their use of the driveway. Fourth, Petitioners seek damages to reimburse them for expenses they incurred as a result of Kleiner's actions. They also request their attorneys' fees. Lastly, Bogia brings a claim for adverse possession for the disputed strip of land between the rear of her property and 717 South Scott Street.

The parties appeared for trial on December 3, 2018, and then submitted post-trial briefing. This is my post-trial opinion.

## II. ANALYSIS

The parties framed their dispute as whether the original deeds for multiple homes abutting the driveway granted an easement for "driveway purposes," and asked the Court to interpret the scope of any such easement defined by that language. However, the record contains the original deed only for Bogia's residence at 710

---

[54] *Id*. at 2.

12

South Lincoln Street. Kleiner recognizes that twenty-seven other deeds from Fortunato contained that language, but those deeds are not in the record, so the Court is not certain that the properties owned by Petitioners other than Bogia were conveyed using that language. Further, the deeds by which some of the other Petitioners purchased their homes do not use the "driveway purposes" language that the parties have asked the Court to construe.[55] This opinion thus focuses on Bogia's rights, as hers is the only property for which the record contains both a first deed and current deed that use the disputed "driveway purposes" language.[56]

The analysis below may extend to other Petitioners' properties if they are defined by the same or similar language. The Court requests that the parties review the Petitioners' deeds and determine if they can agree on the application of this ruling. If they agree, they should address each Petitioner's property in the implementing order requested below. If they cannot, the Court will resolve the

---

[55] For example, Burke's deed says, "TOGETHER, with the free use and privilege of using said common driveway with others entitled thereto forever and being subject to an equitable share of the keeping said common driveway in repair." JX 10 at 3; *see also* JX 12 at 96; JX 13 at 1; JX 14 at 211. The most recent deed for the Chebans' property contains the driveway purposes language, JX 11 at 274, but the Court does not have the original deed to confirm that the original grant included "driveway purposes." The parties did not detail the original grants by property or address whether they survived through to the current owners.

[56] JX 9 at 255; JX 8 at 79.

dispute after the parties provide the relevant deeds going back to the original easement in the 1940s, as well as supplemental briefing.

## A. Bogia Is Entitled To A Declaratory Judgment That An Easement Exists In Her Favor.

Petitioners seek a declaratory judgment to clarify their rights as to the driveway. Kleiner has "cast a cloud upon a property right . . . but [has not] moved forward to litigate the claim."[57] In such a situation it can be necessary for the Court to define the parties' rights.[58] For that reason "Delaware courts routinely grant declaratory relief in actions involving easements."[59]

The parties first dispute whether there is an easement at all. The language in the original deed for 710 South Lincoln Street makes clear that there is. "An easement is a non-possessory interest in real property, granted for a particular purpose, enforceable of right and not [dependent] for its continued existence on the will of the grantor."[60]

Vice Chancellor Glasscock has summarized easements thusly:

Two types of easements, generally speaking, exist; easements appurtenant to the properties at issue, and easements in gross. The

---

[57] *Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1240 (Del. Ch. 1987).

[58] *Id.* at 1239-40; *see also Green v. Templin*, 2010 WL 2734147, at *8 (Del. Ch. July 2, 2010) ("A declaratory judgment is a mechanism designed to afford relief from uncertainty regarding rights.").

[59] *Green*, 2010 WL 2734147, at *8.

[60] *Coker v. Walker*, 2013 WL 1858098, at *3 (Del. Ch. May 3, 2013).

14

former, as the name implies, form a part of the properties and run with the land; the benefit of an easement in gross, conversely, is personal to the grantee. In order for an easement to be deemed appurtenant, it must bear some relationship to the use of the dominant estate existing for the benefit of the dominant estate as an entity. When a writing creating an easement is susceptible to construction as creating an easement in gross as well as an easement appurtenant, public policy favors construction as the latter. Since an easement in gross is personal to the grantee, as a general matter it dies with the grantee; easements appurtenant are integral to and an attribute of the adjacent parcels— consequently, they run with the land and bind successors-in-title.[61]

"An easement can generally be created by express grant or reservation, by implication, or by prescription."[62] "A finding of an express easement is proper if the deed 'contain[s] plain and direct language evidencing the grantor's intent to create a right in the nature of the easement.'"[63] "No specific words are required so long as the writing clearly reflects the grantor's intent to create a right in the nature of an easement."[64]

Here, the original deed for 710 South Lincoln Street contains an express grant.[65] The language at issue reflects a clear intent to create a right in the nature of an easement appurtenant. The deed for the dominant estate (710 South Lincoln

---

[61] *Coker*, 2013 WL 1858098, at *5 (internal citations and marks omitted).

[62] *Sandie, LLC v. Plantations Owners Ass'n, Inc.*, 2012 WL 3041181, at *7 (Del. Ch. July 25, 2012).

[63] *Black v. Staffieri*, 2014 WL 814122, at *2 (Del. Feb. 27, 2014) (quoting *Rago v. Judge*, 1989 WL 25802, at *5 (Del. Ch. Mar. 16, 1989)).

[64] *Black*, 2014 WL 814122, at *2.

[65] JX 9.

Street) granted the "free and uninterrupted right, use and privilege" to use the driveway "in common with others entitled thereto forever."[66] And the Fortunato Deed for the servient estate (717 South Scott Street) made clear that the rights, uses, and privileges associated with the driveway were to be exercised "in common with others entitled thereto forever."[67] The deed shows an intent to grant a non-possessory interest to 710 South Lincoln Street, and grants an express easement appurtenant.

## B. The Scope Of The Easement Includes Bogia's Requested Uses.

The scope of the easement presents a harder question. The original deed for 710 South Lincoln Street allowed the right, use, or privilege of the driveway "for driveway purposes," to be exercised in common with others. The practical issue the parties presented is whether "driveway purposes" includes parking cars, placing trash cans on the driveway for pickup, and using the space for recreational activities.[68]

"Deeds are specialized forms of contract, and like other contracts are not subject to construction unless the language is ambiguous."[69] "In construing the

---

[66] JX 9 at 255.

[67] JX 3 at 403.

[68] D.I. 1 ¶ 39; D.I. 5 ¶ 39.

[69] *Jestice v. Buchanan*, 1999 WL 962591, at *2 (Del. Ch. June 14, 1999).

instruments in question, the Court will look to evidence of the grantors' intent at the time of the instruments' execution."[70]

At trial and in briefing, neither party provided an encompassing definition for the term "driveway purposes." Neither party cited dictionaries or other similar sources to attempt to define the term's plain meaning.[71] Kleiner compares the language to a 1946 deed that contained language allowing the use "for parking and driveway purposes," and asserts that proves that in the 1940s, the term "driveway purposes" excluded parking.[72] But that case dealt with commercial lots as both the dominant and servient estates, and the easement encompassed both a common driveway and defined parking spots.[73] That single example does not prove it was customary to differentiate between "parking and driveway purposes" at that time.

---

[70] *Francis v. Macklin*, 1990 WL 100799, at *2 (Del. Ch. July 19, 1990); *see also Lawhon v. Winding Ridge Homeowners Ass'n, Inc.*, 2008 WL 5459246, at *6 (Del. Ch. Dec. 31, 2008) ("The provision will be construed by seeking to determine original intent from the plain and ordinary meaning of the words chosen."); *Frederick Jensen & Sons, Inc. v. Mustard*, 2004 WL 718922, at *2 (Del. Ch. Mar. 30, 2004) (applying doctrine of easement by necessity in scope "as would have been contemplated by the parties at the time of partition, *in 1911*" (emphasis in original)).

[71] Some of the cited cases did cite dictionary definitions from the era. *See Dolske v. Gormley*, 375 P.2d 174, 178 (Cal. 1962) ("'Driveway' is defined in Webster's New World Dictionary (1951) page 443, as 'a path leading from a garage or house to the street, used especially by automobiles.'"); *Picerne v. Botvin*, 71 A.2d 773, 777 (R.I. 1950) (citing "driveway" from "Webster's New International Dictionary, 2d Ed., 1946, p. 788" as meaning "A passage along which carriages or animals may be driven").

[72] *Black*, 2014 WL 814122, at *1.

[73] *Staffieri v. Black*, C.A. No. 7439-VCL, at *1-3 (Del. Ch. Oct. 24, 2012) (POST-TRIAL ORDER).

Kleiner also strives to define "driveway purposes" using other court decisions that define driveways solely as passageways for ingress and egress. But those courts reached those conclusions in distinguishable contexts: in many of those situations, parking a car would prevent ingress and egress. Those decisions involved:

- A twelve-foot wide easement for a driveway, shared by two adjacent parcels that were previously a single parcel, which traversed the servient estate, provided the only access to the dominant estate, and could not be used if a single car was parked on the driveway.[74]

- An eight-foot wide "easement or right of way for a driveway," that based on "the language of the contract itself," was "merely a driveway," on which no party claimed the right to park.[75]

- A seven-and-a-half foot driveway easement that "was too narrow for a vehicle to turn around" on, reserved "to reach the northerly part of other land," on which no party claimed the right to park.[76]

- A decision that adopted "a narrow construction" of the term "driveway" for a ten-foot wide driveway, and concluded the easement did not include using "the driveway area for general maintenance of that side of [the] property," even though "driveways are commonly used for multifarious additional purposes."[77]

- A short 1909 decision interpreting a 1904 deed that did not involve any claim for the use of automobiles or parking, and

---

[74] *Colburn v. Bailey*, 408 S.W.2d 327, 328-29 (Tex. 1966).

[75] *Frumin v. May*, 251 S.W.2d 314, 319 (Tenn. Ct. App. 1952).

[76] *Picerne v. Botvin*, 71 A.2d 773, 774, 777 (R.I. 1950).

[77] *Dolske*, 375 P.2d at 178.

ruled that the servient estate could not build a fence preventing the dominant estate from using the driveway "as a street."[78]

Two decisions contrary to Kleiner's position stand out. In the first, *Henry v. Murfin*, the Ohio Court of Appeals ruled the dominant estate did not misuse a thirty-two foot wide easement granted for "driveway and yard purposes" by parking a car "on the driveway for almost three years."[79] That court reasoned that because "[c]ars are often parked in driveways," that use was "not inconsistent with the easement's purposes."[80] Second, *Baer v. Dallas Theater Center* dealt with a forty-four foot wide "private road" adjacent to a theater.[81] The court analyzed "the language used, the situation of the parties, the purposes of the grant and the nature of the subject matter."[82] The court affirmed the decision that the dominant estate had the right to park vehicles on the space because the easement was an express grant, "not limited to [the] mere right of ingress and egress," and the area surrounding the theater had no other parking to accommodate patrons.[83] In so doing,

---

[78] *Young v. Braman*, 75 A. 120, 120-21 (Me. 1909).

[79] 1995 WL 324058, at *4 (Ohio Ct. App. May 31, 1995).

[80] *Id.*

[81] 330 S.W.2d 214 (Tex. Civ. App. 1959).

[82] *Id.* at 219 (quoting *Joyner v. R.H. Dearing & Sons*, 134 S.W.2d 757, 759 (Tex. Civ. App. 1939)).

[83] *Id.* at 218-19.

the court distinguished the facts from other cases "involv[ing] obstruction of common driveways and alleys."[84]

These decisions are supported by secondary sources.

> [I]t has been held that under a driveway easement, or a right of way for ingress and egress, the owner of the dominant estate has no absolute right to park his vehicles on the driveway or right of way, but does have a right to park in such a manner as not to interfere with the use of the property by the owner of the servient estate.[85]

And:

> Where two or more persons have a common easement over a driveway, or have any other right of way which is, by its express terms, or is held to be by construction or implication merely a right of way for ingress and egress, the courts which have passed on the question have held or indicated that while neither owner has any absolute right to park vehicles on the driveway or right of way, each has a right to park thereon at such times and in such a manner as not to interfere with its use by the other.[86]

These decisions, and those Kleiner relies on, suggest that "driveway purposes" vary based on the driveway's size and how the driveway, grantor, and grantee are situated on the properties. I conclude that the relevant deed language of "driveway purposes" is ambiguous and that extrinsic evidence must be considered to define those terms.[87]

---

[84] *Id.* at 219.

[85] M.O. Regensteiner, Annotation, *Right To Park Vehicles On Private Way*, 37 A.L.R.2d 944 §2[b] (1954).

[86] *Id.* §2[a].

[87] *See Lawhon*, 2008 WL 5459246, at *6 ("If that language is unambiguous then no other evidence is necessary to determine intent. However, if the language is ambiguous-i.e.

20

In construing an ambiguous deed, "the deed must be read in the light of the intent of the parties as determined by the facts and circumstances surrounding the transaction."[88] Any uncertainties "must be resolved in favor of the grantee as long as such a construction does not violate any apparent intention of the parties to the transaction."[89] Several facts provide context for the deeds here.

The first is the size of the driveway. According to the deeds, the driveway is twenty-five feet wide.[90] There is an additional approximate eight-foot strip immediately next to the garages that is not subject to the easement.[91] Between the driveway and that strip, the paved area is about thirty-three feet wide.[92] There is enough space to accommodate both Bogia's uses and Kleiner's customers at the same time. Indeed, Kleiner never had to tow a car to allow a customer to access a garage.[93] The driveway can accommodate reasonable parking and use (*i.e.*, no double- or triple-parked cars) by both the dominant and servient estates. This is

---

reasonably susceptible of different interpretations-the Court may consider extrinsic evidence to determine grantor intent at the time of its execution.").

[88] *Rohner v. Niemann*, 380 A.2d 549, 552 (Del. 1977).

[89] *Id*.

[90] D.I. 21 at 3; *see* JX 9 at 255.

[91] There are small differences in the width on different sides of the garage, ranging from 7.5 feet to 8.1 feet. JX 22; Tr. at 127-28 (Kleiner).

[92] JX 22; Tr. at 127-28 (Kleiner).

[93] Tr. at 125.

21

important context, because the permissible uses of a twenty-five-foot driveway may differ significantly from the permissible uses of an eight-foot driveway, where parking would block ingress and egress. *Henry v. Murfin* addressed a thirty-two foot wide driveway, and concludes that "[c]ars are often parked in driveways" and that such a use was "not inconsistent with the easement's purposes."[94]

Second, decades of conduct show that the dominant and servient estates can coexist with greater easement rights than Kleiner has allowed. "[W]hen the nature and extent of a granted right is ambiguous or doubtful under the terms of the grant, the exercise of the right by its holder, acquiesced in by the grantor, establishes its extent."[95] The established practices are traceable only to the 1960s, not to the 1940s. But there is no evidence that any previous owner of 717 South Scott Street ever objected to the use of the driveway for parking cars.

Third, the driveway is to be used in common, and the deeds require the homeowners to contribute to the driveway's maintenance. If Bogia cannot park on the driveway, she can only use the driveway for vehicular ingress or egress if she clears a parking area on her own property. Few homeowners have added such a garage or parking area. The effect of Kleiner's interpretation, which has in fact

---

[94] 1995 WL 324058, at *4.

[95] *Richard Paul, Inc. v. Union Imp. Co.*, 91 A.2d 49, 53 (Del. 1952).

played out,[96] is that homeowners such as Bogia would rarely use the driveway, while garage customers would use the driveway freely. In that scenario, Bogia and others are responsible for maintenance for a driveway they cannot use. That is not supported by logic or the language of the deeds, and contradicts the principle of interpreting the rights granted in the easement in favor of the grantee.

The above analysis leads to the same result about trash pickup and use of the driveway for recreational purposes. The size of the driveway makes both feasible. The unrebutted evidence proves that the City of Wilmington picked up trash, and children played in the driveway, going back to the 1960s.[97] There is no evidence that trash pickup or childrens' activities, such as riding bikes or similar vehicles,[98] prevented customers from accessing the garage.

I conclude Bogia is entitled to a declaratory judgment that her deed expressly granted an easement appurtenant permitting use of the driveway for "driveway purposes." I further interpret "driveway purposes" to include parking cars, setting trash out for pickup, and recreational use. "It is assumed that the owner of an easement and the possessor of the servient tenement are to exercise their respective

---

[96] Tr. at 126 (Kleiner agreeing that residents now "hardly go back" to the driveway "at all").

[97] Tr. at 8, 18-19 (Bogia).

[98] *See* JX 19.

23

rights and privileges in a spirit of mutual accommodation."[99]  Here, Bogia testified that the homeowners had been good neighbors and accommodated the customers' needs.[100]  Her uses "must not [] interfere with the use of the property by the owner of the servient estate," namely Kleiner and his customers.[101]

## C.    Bogia Is Entitled To Injunctive Relief.

Bogia requests a permanent injunction against Kleiner to prevent him from limiting, denying, or terminating her use of the driveway.  The elements to obtain a permanent injunction are:  "(1) actual success on the merits; (2) irreparable harm will be suffered if injunctive relief is not granted; and (3) the harm that will result from a failure to enjoin the actions that threaten plaintiff outweighs the harm that will befall the defendant if an injunction is granted."[102]  An injunction is a proper way to prevent continued interference with an easement.[103]

---

[99] *Baer*, 330 S.W.2d at 219 (quoting Restatement (First) of Property § 485 (1944)); *see also* Restatement (Third) of Property §§ 4.9 & 4.10 cmt. a (2000) ("In the absence of detailed arrangements between them, it is assumed that the owner of the servitude and the holder of the servient estate are intended to exercise their respective rights and privileges in a spirit of mutual accommodation.").

[100] Tr. at 12-13, 47.

[101] Regensteiner, 37 A.L.R.2d 944 §2[b].

[102] *Sierra Club v. DNREC*, 2006 WL 1716913, at *3 (Del. Ch. June 19, 2006), *aff'd*, 919 A.2d 547 (Del. 2007).

[103] *See Rowe v. Everett*, 2001 WL 1019366, at *7 (Del. Ch. Aug. 22, 2001) (adopting then-Master Glasscock's ruling that "[h]aving established their ownership of the easement, the plaintiffs are entitled to enjoin the defendant's interference with their use of the easement unless equitable considerations preclude entry of the injunction."); *see also Richard Paul*, 91 A.2d at 54 ("There is little question but that equity in a proper case will

Bogia has satisfied all three elements. She has proven her rights to an easement. The dispute over the easement's scope "fits squarely within this Court's prior findings that 'interference with a property right constitutes irreparable harm,' and that 'loss of a property right is itself sufficient to support [an] injunction.'"[104] And the balance of harms favors Bogia. Without an injunction, her use of the easement will essentially cease, as Kleiner admits.[105] With an injunction, Kleiner will be in the same situation as his predecessors were for nearly seventy years, of navigating the occasional inconvenience from concurrent uses by residents and customers in a confined urban space. There is no evidence those conditions are unworkable or that they impose significant costs or harm on Kleiner. Kleiner is enjoined from preventing Bogia's use of the easement.

Bogia may inform the Public Works Department of this ruling and ask that it return to its previous route. But the Department of Public Works is not a party to this litigation, and retains the ultimate authority over where it will perform its work.

---

enjoin the continued obstruction of an easement, and that the obstruction of an easement of itself is sufficient to show the irreparable nature of the injury and the inadequacy of the remedy at law.").

[104] *Kuhns v. Bruce A. Hiler Del. QPRT*, 2014 WL 1292860, at *23 (Del. Ch. Mar. 31, 2014) (quoting *Vansant v. Ocean Dunes Condo. Council Inc.*, 2014 WL 718058, at *1 (Del. Ch. Feb. 26, 2014) and *Jestice v. Buchanan*, 2000 WL 875417, at *3 (Del. Ch. May 23, 2000)), *aff'd sub nom. Hiler v. Kuhns*, 116 A.3d 1243 (Del. 2015).

[105] Tr. at 126 (Kleiner).

My ruling is simply that Kleiner's objection cannot be the reason it refuses to conduct pickups in the driveway.

### D. Bogia Has Established Adverse Possession.

Bogia claims she should receive title of the disputed strip of Kleiner's property immediately beyond her rear property line. Delaware has codified the common law cause of action for adverse possession at 10 *Del. C.* § 7901. The elements of a valid claim to title through adverse possession are "(1) open and notorious, (2) hostile and adverse, (3) exclusive, (4) actual possession, (5) that was continuous for twenty years."[106] Bogia must prove her claim by a preponderance of the evidence.[107]

"Open and notorious means that the possession must be public so that the owner and others have notice of the possession. If possession was taken furtively or secretly, it would not be adverse and no title possession could be acquired."[108] Bogia's possession was both open and notorious: the land was enclosed by Bogia's publicly visible fence.[109] Kleiner says the area Bogia claims is so small that no one could have been aware of the taking. Legally, that argument is unsupported. Factually, Kleiner's 2015 survey readily identified the issue. 717 South Scott Street

---

[106] *Tumulty v. Schreppler*, 132 A.3d 4, 24 (Del. Ch. 2015).

[107] *Id.* at 24.

[108] *Walker v. Five N. Corp.*, 2007 WL 2473278, at *4 (Del. Super. Ct. Aug. 31, 2007) (citations omitted).

[109] *Tumulty*, 132 A.3d at 23 ("The open and notorious elements are considered together, as each term essentially is duplicative of the other.").

26

changed hands many times, and any previous survey would have revealed the same open and notorious use.

"The terms 'adverse use' and 'hostile use' are used interchangeably."[110] "A use is adverse or hostile if it is inconsistent with the rights of the owner."[111] Said differently, "[h]ostile means against the claim of ownership of all others, including the record owner."[112] Bogia and previous owners of her property used the area in a way that was inconsistent with the rights of the owner of 717 South Scott Street. They fenced in the land, and used it for personal activities such as gardening.[113]

For the same reasons, Bogia has established exclusive possession. "Exclusive possession means that the adverse possessor must show an exclusive dominion over the land and an appropriation of it to his or her own use and benefit."[114] The use of a fence, though unnecessary, shows exclusive possession of a defined area.[115]

---

[110] *Berger v. Colonial Parking, Inc.*, 1993 WL 208761, at *4 (Del. Ch. June 9, 1993).

[111] *Id.*

[112] *Mitchell v. Dorman*, 2004 WL 117580, at *2 (Del. Ch. Jan. 16, 2004) (internal marks omitted) (quoting *Steller v. David*, 257 A.2d 391, 394-95 (Del. Ch. 1969)).

[113] Tr. at 26.

[114] *Walker*, 2007 WL 2473278, at *4.

[115] *See Tumulty*, 132 A.3d at 28 (stating that "[w]hile a fence surely would have shored up Schreppler's claims, fences are not required for a successful adverse possession claim"); *see also Justice v. McGinn*, 2001 WL 1088760, at *4 (Del. Ch. Aug. 29, 2001) ("The property must also be of fixed and definite boundaries, although it need not be enclosed by fences.").

Finally, Bogia has established continuous possession for more than twenty years. Kleiner asserts Bogia must establish this element through expert testimony, and has failed to do so. His theory is that Bogia installed the current fence in 2005, and has submitted only her own testimony that the previous fence was in the same spot.[116] The argument is not persuasive. Bogia's testimony that the vinyl fence replaced the previous fence, and is in the same spot as the previous fence, is unrebutted.[117] No expert witness is needed to establish the location of the fence.

For these reasons, I conclude Bogia has established title to the disputed land by adverse possession.[118]

### E. Petitioners Are Not Entitled To Attorneys' Fees, But Bogia Is Entitled To Her Costs Related To Towing.

"Under the American Rule and Delaware law, litigants are normally responsible for paying their own litigation costs."[119] Petitioners argue that Kleiner

---

[116] D.I. 21 at 17. Kleiner does not argue the change in ownership matters. Though not addressed by the parties, Delaware law permits tacking successor owners together, so Bogia could count her predecessor's use of the fenced-in, disputed area before Bogia's purchase in 1998 to calculate the twenty years of possession. *See Matter of Campher*, 1985 WL 21134, at *2 (Del. Ch. Mar. 20, 1985) ("The 20 year period may be established by tacking on the periods when the property was held by successive adverse holders."); *see also Brown v. Houston Ventures, L.L.C.*, 2003 WL 136181, at *7 (Del. Ch. Jan. 3, 2003) (combining ownership of successive owners in analyzing claim for prescriptive easement).

[117] *See supra* at 10-11, n. 48.

[118] The strip of land for which Bogia obtained fee simple title through adverse possession was originally part of the easement. Accordingly, Bogia's easement is no longer twenty-five feet. The parties should take care to note this point in the implementing order.

[119] *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

28

sought to prevent Petitioners from enjoying their rights, and that he did so in bad faith.

"There is no single standard of bad faith that justifies an award of attorneys' fees—whether a party's conduct warrants fee shifting under the bad faith exception is a fact-intensive inquiry."[120] "Delaware courts have previously awarded attorneys' fees where (for example) 'parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims.'"[121] "Ultimately, the bad faith exception is applied in extraordinary circumstances primarily to deter abusive litigation and protect the integrity of the judicial process."[122]

As the above discussions show, Kleiner asserted legitimate arguments in defending against Petitioners' claims on ambiguous language. With no special circumstances warranting shifting fees, each party bears its own costs.

On top of attorneys' fees, Bogia seeks damages in the form of reimbursement of her expenses related to the towing of her vehicle at Kleiner's request. Kleiner caused Bogia's car to be towed when she had the right to park in the driveway, as explained above. She is therefore entitled to those expenses upon filing an affidavit

---

[120] *Auriga Capital Corp. v. Gatz Props., LLC*, 40 A.3d 839, 880-81 (Del. Ch. 2012).

[121] *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005) (quoting *Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 546 (Del. 1998)).

[122] *Nichols v. Chrysler Gp., LLC*, 2010 WL 5549048, at * 3 (Del. Ch. Dec. 29, 2010).

of those expenses, supported by receipts and proofs of payment, which shall occur within thirty days.

## III.   CONCLUSION

The parties shall submit a jointly proposed order addressing each of Petitioners' properties within thirty days, which shall be suitable for filing with the Recorder of Deeds.[123]

---

[123] I asked the parties to address how any ruling here could impact nonparty homeowners on the block with similar language in their deeds.  After reviewing the parties' submissions, it seems the proper course is to let doctrines such as *stare decisis* and collateral estoppel govern future litigation, if necessary.